264 N.J. Super. 385 (1993)
624 A.2d 1017
ADOLPHUS L. BUSCH AND DOLORES R. BUSCH, PLAINTIFFS-APPELLANTS,
v.
CHARLES R. BIGGS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted March 15, 1993.
Decided May 18, 1993.
*388 Ozzard, Wharton, Rizzolo, Klein, Mauro, Savo & Hogan, attorneys for appellants (William B. Savo and Arthur D. Fialk, on the brief).
Suarez & Suarez, attorneys for respondent (Vincent F. Puccio, on the brief).
Before Judges PETRELLA, LONG and KEEFE.
The opinion of the court was delivered by LONG, J.A.D.
In 1970, plaintiffs, Adolphus L. Busch and his wife, Dolores R. Busch purchased two contiguous parcels of land in Washington Township, Warren County. In 1977, they initiated proceedings to subdivide the land. Subdivision never materialized however because plaintiffs' applications were not formalized.
In July, 1985, plaintiffs submitted a twenty-eight (28) lot development proposal for the land to the Washington Township Planning Board. The Board raised concerns regarding "... the type of road going up the hillside and the steepness of the lots and so forth." Additionally, the Board was concerned with the size of a *389 planned cul-de-sac. Subsequently, in November, 1985, a revised sketch plan was rejected as incomplete "... because it didn't have all of the detail engineering work on it." Nothing further was done to correct the deficiencies in this application.
At some point between November, 1985 and May, 1986, plaintiffs became aware that an adjoining parcel of land was being developed by SBF Partnership ("SBF"). Plaintiffs discovered that the road layout proposed by SBF "... came right up to [their] property ..." thus affording them a method of simplifying the development of their plat. Armed with this information, in July or August, 1986, plaintiffs prepared a sketch plat of their land "... which showed a tie-in to [SBF's] road system." Plaintiffs submitted this "possible solution" to the Board. However, this was done without consulting SBF which objected to the tie-in. Thus, the Board never voted on the proffered solution.
Later, plaintiffs approached Tom Pfalth of SBF regarding the tie-in. SBF sought drainage easements over plaintiffs' property in exchange for the tie-in to SBF's roadway. Additionally, plaintiffs agreed not to submit a formal subdivision application until SBF received preliminary approval of its application. This was done to avoid having the Board require SBF to revise its road layout because the cul-de-sac proposed by plaintiffs, which would tie into SBF's road, would be too long. Although the agreement between plaintiffs and SBF was never reduced to writing, plaintiffs granted the drainage easement.
SBF received preliminary approval in October, 1986. Plaintiffs then submitted "... a full blown application [with] complete engineering details ..." to the Board in or about November, 1986.
Defendant, Charles R. Biggs was employed as Township Engineer for Washington Township during the period in which plaintiffs sought to subdivide their property. As such, defendant had occasion to review plaintiffs' November, 1986 application. On November 18, 1986, he determined that the application was incomplete, noting in a check list the specific deficiencies.
*390 Plaintiffs described the deficiencies as "relatively minor" and quickly remediable except for the requirement of road cross sections at intervals of fifty (50) feet. At the subsequent Planning Board hearing on November 19, 1986, plaintiffs' application was ruled incomplete. Plaintiffs later submitted revised drawings containing, among other things, the requisite road cross sections. At the subsequent December 17, 1986 Planning Board hearing, plaintiffs' revised application was ruled complete.
Plaintiffs had hoped to "grandfather" their application to avoid new zoning ordinances which became effective in January, 1987. To do so, plaintiffs' application had to be completed by November, 1986 so that a public hearing could take place in December, 1986, thereby preserving the "grandfather" strategy. Thus, after their application was deemed complete in December, 1986, plaintiff asked the Board for grandfather status. The request was denied. Consequently, plaintiffs had two viable alternatives: to proceed with the complete application in spite of the pending ordinance change and, if necessary, to seek a variance; or to withdraw the application. Ultimately, plaintiffs chose to withdraw the application based upon the advice of counsel. The withdrawal was voluntary, unconditional and without reservation.
In January, 1987 and in conformity with the newly enacted Washington Township ordinance, plaintiffs submitted a revised application to the Planning Board, reducing the number of lots on its subdivision plat from twenty-eight (28) to twenty-one (21). Meanwhile, SBF repudiated its oral agreement to tie plaintiffs' property into its roadway. In February, 1987, plaintiffs submitted another revised application reflecting, among other things, the loss of the tie-in to SBF's roadway. Additionally, the number of lots on plaintiffs' subdivision plat was reduced from twenty-one (21) to ten (10). On April 29, 1987, plaintiffs' application was denied by the Planning Board.
In June, 1987, plaintiffs filed an action in lieu of prerogative writs against the Planning Board, SBF, Washington Township and Warren County. The complaint expressly focused on the April 29, *391 1987 denial of plaintiffs' subdivision application. However, the complaint referred to prior events as well:
On numerous occasions, plaintiffs revised the said subdivision application in accordance with the requirements and suggestions of defendant, Planning Board, eventually reducing the number of proposed lots from 28 as originally submitted to 10 in the final application.
On February 8, 1988, in response to a motion by the Planning Board, partial summary judgment was entered in favor of the Board and Washington Township on a claim of inverse condemnation as well as all claims for compensatory and punitive damages. On October 14, 1988, the matter was remanded to the Planning Board for clarification of the reasons warranting denial of plaintiffs' application and for further consideration of the application.
Pursuant to the remand, Board hearings were held on December 28, 1988, January 19, 1989, March 30, 1989 and October 25, 1989. An expert in hydraulic and hydrolic studies reviewed plaintiffs' ten (10) lot proposal and testified at the hearings as to his findings. At the January 19, 1989 hearing, the Board advised plaintiffs of revisions to the ten (10) lot plan which would result in "favorable consideration" of the application by the Board. Subsequently, at the March 30, 1989 hearing, plaintiffs asked the Board to consider subdivision of the land into twenty (20) lots with two roads. In response, the Board gave plaintiffs the option of proceeding with the ten (10) lot plan or submitting a modified twenty (20) lot plan involving a looped road. Because plaintiffs could not create the requisite looped road, a final hearing on the ten (10) lot plan was held on October 25, 1989.
On November 29, 1989, the Board adopted a resolution memorializing the deficiencies in the last design of the ten (10) lot subdivision proposal as well as the deficiencies in the twenty (20) lot subdivision proposal of March, 1989. As to the (10) lot proposal, the Board stated:
1. The ten lot subdivision plan with only a lower road (sometimes referred to as the February, 1987 Plan) is unacceptable in its present form because of the following:
A. The driveways as designed do not have sufficient turning radii for emergency vehicles.

*392 B. The stormwater management aspects of the plan need considerable additional detail and design revisions.
C. The plan creates flag lots, the overall lot design of which adversely affect other lots and the overall tract, contrary to Section 123-32.1 of the Zoning Ordinance.
D. Proposed Lot 19.12 which consists of 2.826 acres is unsuitable because it has a drainage easement for a detention basin over approximately one-third of its area and a 20 foot by 400 foot drainage swale easement nearly bi-secting its building envelope.
E. Proposed Lot 19.11 has no true street frontage, only frontage to the hammerhead cul-de-sac.
F. Proposed Lot 19.10 has its only frontage via a "flag stem" which has a length of approximately 1,100 feet. The flag stem is not to be utilized for access to the lot, but exists solely so that the lot in question can technically be called a flag lot. If the flag pole were used for access to this lot, a driveway over this route would be both costly and disruptive to other residents whose houses would lie in relatively close proximity to either side of the flag stem and would disrupt the flow of drainage.
G. Proposed Lot 19.08 fronts on the hammerhead cul-de-sac with only 35 feet of true street frontage.
H. Proposed Lot 19 is a flag lot with a proposed "flag stem" rising 60 feet over its 350 foot course for an average grade of approximately 17%. Satisfactory access is impossible over this flag stem.
I. There is an existing woodroad which runs roughly parallel to the course of Arbor Drive Extension and runs onto proposed Lot 19 from proposed Lot 19.04. The existence of this woodroad is ignored in the design of the subdivision.
J. The driveways as designed appear to meet the driveway ordinance as to slope, but can only do so by traversing various lots outside of the lot lines of those lots. The driveway to Lot 19 commences on Lot 19.05, crosses onto Lot 19 slightly north of the flag pole, then cuts back across the hillside re-entering Lot 19.05 and crossing the top of that lot until it re-enters Lot 19 at another switchback. It is approximately 1,500 feet long. A common driveway serves Lots 19.10 and 19.11 and enters Arbor Drive Extension somewhat east of the hammerhead. It is approximately 500 feet long. Another common drive serves Lots 19.09, 19.08, 19.07 and 19.06 and enters the northside of Arbor Drive Extension slightly east of the entrance of the common drive referred to above. It is approximately 700 feet long. In several locations, the driveway designs are such that they do not have sufficient turning radii for emergency vehicles.
K. The offsetting entry of driveways onto Arbor Drive Extension is hazardous.
L. A better lot layout could be achieved for the lands in question by the creation of larger lots encompassing the entire parcel.
M. The applicant has not carried its burden of proof of establishing that proposed subdivision can be accomplished without detriment to the public good.
N. The proposed lot layout, including the extent of drainage easements over Lot 19.12, the lack of effective road frontage on Lots 19.11 and 19.08, the flag lot (Lot 19.10) with an extraordinarily long flag stem and the fact that several lots *393 require very long access driveways serving up to 4 dwellings in the case of driveway "B", over areas other than the lots themselves, is contrary to good planning practices.
O. Eight out of the ten lots are deficient under the Slope Ordinance adopted by the governing body in April, 1987. Each lot is required to have 120,000 square feet of lot area after application of the slope factor. When the slope factor of the Ordinance is applied, Lot 19.04 has 51,952 square feet; Lot 19.05 has 40,256 square feet; Lot 19.07 has 14,264 square feet; Lot 19.08 has 13,176 square feet; Lot 19.10 has 84,400 square feet; Lot 19.11 has 53,776 square feet; Lot 19.12 has 59,008 square feet and Lot 19.06 has 84,800 square feet.
With respect to the twenty (20) lot proposal, the Board stated:
2. The modified plat presented at the March 30, 1989, meeting of the Board consisting of 20 lots with a lower road and an upper road is unacceptable because of the following:
A. The extension of Mountain View Drive from its present terminus to the proposed cul-de-sac on the applicants' lands would create a cul-de-sac with a length of over 5,200 feet, which cul-de-sac road would serve a total of approximately 47 single family lots. The Township Road Specifications Ordinance adopted December 30, 1986, provides in Section 99-3(1) that "the length of deadend roads shall not exceed 1,200 feet. The allowable length shall be further limited by the requirement that there may not be more than 20 single family lots using the road for access." The applicants' engineer testified that the generally accepted planning standard for the maximum number of lots to be served by a cul-de-sac is approximately 30 lots.
B. Although the 20 lot proposal might be capable of being designed in an acceptable manner if the extension of Mountain View Drive could be looped to connect with itself through the SBF subdivision, the applicants have determined that such arrangement is not possible.
C. The design of the subdivision does not conform with the existing Steep Slope Ordinance nor does it totally conform with certain modifications of that Ordinance which have been permitted in the past.
D. No drainage calculations have been submitted with reference to the revision of the plat to include the upper road and no drainage facilities are shown on the entire plat.
The Board set forth the following suggested modifications to the ten (10) lot proposal which would result in reconsideration:
3. The Board would give further consideration to the applicants' plan if the 10 lot or February, 1987 Plan were modified in the following manner:
A. Extension of the roadway approximately 300 feet.
B. Revision of the hammerhead cul-de-sac to a tangential or circular cul-de-sac, depending upon the slope at the termination of the roadway as extended.
C. Extension of public water supply to the highest available elevation on the site, together with installation of appropriate fire hydrants.
D. The establishment of a building footprint on each lot in order that a detailed driveway design can be established for that particular building location on the lot.

*394 E. Elimination of common driveways and driveways crossing other lots.
F. A design of the subdivision conforming as closely as possible to the Steep Slope Ordinance of April, 1987, which would include a maximum of 11 lots on the site and all reasonable attempts to design lots which conform individually to the steep slope requirements.
G. Compliance with the suggestions of Alfred R. Pagan, P.E. as to drainage design and improvements and providing complete engineering detail for that design and those improvements.
H. The red[e]sign should take into account comments in Charles Biggs' letter of January 19, 1989.
I. A specific condition shall be imposed that there be no blasting in connection with the installation of any improvements on the tract.
J. Some proposal by the applicants as to provisions for security for the adequacy of the functioning of the stormwater management structures over and above the required improvement maintenance bond.
4. The Board will not act on any preliminary plat until proof is provided of payment of all real property taxes on the property in question.
5. The Board is bound by the existing ordinances of the Township at this point in time. However, the Board does have authority to grant appropriate variances pursuant to N.J.S.A. 40:55D-70(c) from certain bulk requirements upon presentation of appropriate evidence.
Finally, the resolution concluded:
NOW THEREFORE, BE IT RESOLVED by the Washington Township Planning Board as follows:
1. In the event a modified plat designed to meet the aforestated conditions is submitted within 60 days of the date of memorialization of this resolution, the Board will authorize an engineering review of the plat and will continue consideration of the plat in accordance with municipal ordinances and this and previous resolutions of the Board.
2. In the event a modified plat designed to meet the aforestated condition[s] is not received within 60 days of the date of memorialization of this resolution, the application shall be considered to be denied in its entirety.
No modified plat was received and thus the Board adopted a resolution on March 7, 1990 denying plaintiffs' application for preliminary major subdivision approval.
This denial was affirmed by the trial judge on September 7, 1990. An order was entered staying the counts of the prerogative writs complaint involving SBF pending resolution of plaintiffs' interlocutory appeal to us. On October 22, 1991, we affirmed the judgment of the trial court.
In the interim, on December 12, 1989, plaintiffs filed a complaint against defendant, Charles Biggs alleging that through his negligent *395 and/or intentional and malicious acts, plaintiffs were unable to obtain approval of their subdivision application. Defendant answered and moved for summary judgment on several grounds including the entire controversy doctrine. The trial judge based his grant of summary judgment on the entire controversy doctrine, the law of the case doctrine and waiver.
Plaintiffs appeal contending that this action focused exclusively on the denial of the 1987 application and in no way implicated the withdrawn 1986 application. Thus, plaintiffs argue that the claims against defendant arose from a separate controversy thereby precluding application of the entire controversy doctrine. Alternatively, plaintiffs argue that the prerogative writs action is still pending due to the stay imposed on the counts against SBF and thus this action against defendant should have been consolidated therewith under Burrell v. Quaranta, 259 N.J. Super. 243, 612 A.2d 379 (App.Div. 1992). Finally, plaintiffs contend that the entire controversy doctrine is inapplicable because the claims against defendant were unknown and unaccrued at the time of the time of the filing of the complaint in lieu of prerogative writs.
Defendant counters that the 1986 application was an integral issue in the prerogative writs action in which he had a material interest and therefore the entire controversy doctrine bars any and all claims against him in this action. We have carefully reviewed this record in light of these contentions and have concluded that the trial judge reached the right conclusion when he dismissed this action.
Generally, the entire controversy doctrine embodies the principle that the adjudication of a legal controversy should occur in one litigation in one court. Cogdell v. Hospital Ctr. at Orange, 116 N.J. 7, 15, 560 A.2d 1169 (1989).[1] The doctrine requires a party to an action to assert all viable claims and defenses possessed against an adversary which are related to the underlying *396 controversy. Id.; Woodward-Clyde Consultants v. Chemical & Pollution Sciences, Inc., 105 N.J. 464, 473, 523 A.2d 131 (1987).
The entire controversy doctrine furthers the twin goals of efficient judicial administration and fairness to litigants. Woodward-Clyde Consultants, supra, 105 N.J. at 472, 523 A.2d 131. It recognizes the fundamental importance of allowing all parties possessing a material interest which may be affected by the judicial adjudication of a legal controversy to participate in its litigation. Cogdell, supra, 116 N.J. at 23, 560 A.2d 1169. The doctrine encompasses a mandatory rule for the joinder of virtually all causes, claims and defenses relating to a controversy between the parties engaged in litigation. Id. at 16, 560 A.2d 1169. Finally, the doctrine recognizes that it is neither fair nor efficient to fragment a single controversy into separate actions. Woodward-Clyde Consultants, supra, 105 N.J. at 472, 523 A.2d 131.
In the prerogative writs action, after the remand to the Planning Board, plaintiffs filed a brief specifically requesting "approval of the November 1986 subdivision plan submitted by plaintiffs, as modified." Plaintiffs asserted:
At the meeting of November 19, 1986, the Board illegally and improperly ruled plaintiffs' subdivision application incomplete, and refused to schedule it for a hearing. That action was clearly an interlocutory decision by the Board, and not appealable as a matter of right. The action of November 19, 1986 is, therefore, properly before this Court as part of this action in lieu of prerogative writs. (emphasis added).
Plaintiffs concluded that "this prerogative writs action is a timely challenge to [the November, 1986 Board] decision as well as to the decision of April 29, 1987."
In light of this, plaintiffs' argument that defendant's actions arose from a separate controversy is clearly without merit. Plaintiffs' papers in the prerogative writs action demonstrate that the claims against defendant were at issue and were an integral part of the underlying subdivision controversy. Clearly, defendant had a material interest in the outcome of the action, Cogdell, supra, 116 N.J. at 23, 560 A.2d 1169, and should have been a party to it.
*397 The more difficult issue in this case is whether the prerogative writs action concluded prior to the subsequent suit against defendant which is the focus of this appeal. As noted, the trial judge stayed the counts against SBF pending resolution of plaintiffs' interlocutory appeal of the denial of their subdivision application.
If the prerogative writs action was concluded, this action would be barred unless plaintiffs could demonstrate that imposition of the entire controversy doctrine was inequitable and an abuse of discretion. Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 343, 476 A.2d 250 (1984). On the other hand, if the prerogative writs action was not concluded, plaintiffs' claim would not be barred by the entire controversy doctrine:
By timely asserting a claim, even if not joined in the same action, a party can fulfill the goals of the entire controversy doctrine. Other parties are on notice that the claim exists before they take any action with respect to the first claim, and the court, if it desires, can consolidate. That is not possible where the initial claim has been disposed of before the second is asserted. [Burrell, supra, 259 N.J. Super. at 253, 612 A.2d 379].
Plaintiffs argue that because of the stay of their claims against SBF, the first action was pending within the meaning of Burrell when the second action was filed and therefore the proper procedure was to consolidate the cases and not to dismiss this action. Not so.
To be sure, the claims against SBF were stayed and pending when this action was filed. However, it is the nature of the pending claims and not their mere existence which is critical to an entire controversy analysis under Burrell. The original action had two legally distinct elements: the R. 4:69-1 prerogative writs counts which challenged municipal action and the SBF counts which were footed in the alleged breach of the private agreement between SBF and plaintiffs. Clearly, the claims against defendant would not have been resolved in the SBF portion of the case but in the prerogative writs action. To allow plaintiffs to tie the viability of this case to the existence of a wholly distinct action (which is really what the SBF case is and which is the reason why it was stayed while this case went forward on appeal) essentially flies in *398 the face of the salutary purposes informing the entire controversy doctrine and will not be countenanced.
Plaintiffs' further contention that the entire controversy doctrine is inapplicable because their claim against defendant had not matured at the time of the filing of the prerogative writs action is equally unavailing. Specifically, plaintiffs argue:
Whether [defendant's] alleged error or deliberate conduct had ultimately harmful consequences was not clear at the time of filing the prerogative writ action. If a court had required that the 1987 application be approved by the Planning Board, the [defendant's] conduct or negligence may have not resulted in any damages to [plaintiffs].
Defendant counters that plaintiffs' actions regarding the various subdivision applications were made as a result of or in response to actions and recommendations of defendant and therefore plaintiffs were aware of the potential claim against defendant at the time the prerogative writ action was filed.
In Zaromb v. Borucka, 166 N.J. Super. 22, 26-27, 398 A.2d 1308 (App.Div. 1979), a case relied upon by plaintiffs, we indicated that the "outer limits" of a controversy must be empirically examined, focusing on the components of a dispute, in ascertaining whether the entire controversy doctrine applies. Id. at 26, 398 A.2d 1308. Specifically:
... an evaluation must be made of each potential component of a particular controversy to determine the likely consequences of omission of that component from the action and its reservation for litigation another day. If those consequences are likely to mean that the litigants in the action as framed will, after final judgment therein is entered, be likely to have to engage in additional litigation in order to conclusively dispose of their respective bundles of rights and liabilities which derive from a single transaction or related series of transactions, then the omitted component must be regarded as constituting an element of the minimum mandatory unit of litigation. That result must obtain whether or not that component constitutes either an independent cause of action by technical common-law definition or an independent claim which, in the abstract, is separately adjudicable. [Id. at 26-27, 398 A.2d 1308 (quoting Wm. Blanchard Co. v. Beach Concrete Co., Inc., 150 N.J. Super. 277, 293-94, 375 A.2d 675 (App.Div.), certif. den. 75 N.J. 528, 384 A.2d 507 (1977)].
Additionally, in Cafferata v. Peyser, 251 N.J. Super. 256, 260, 597 A.2d 1101 (App.Div. 1991), we recognized the well-settled principle that the entire controversy doctrine does not bar transactionally *399 related claims of which a party was unaware during the pendency of the prior litigation. See also Mauro v. Raymark Indus., Inc., 116 N.J. 126, 135-36, 561 A.2d 257 (1989); Ayers v. Jackson Tp., 106 N.J. 557, 583, 525 A.2d 287 (1987).
Although it is true that the ultimate effect of defendant's allegedly tortious actions could not be ascertained until conclusion of the prerogative writs case, the fact that defendant had acted was clearly known by plaintiffs. Plaintiffs challenged defendant's recommendations throughout the case regarding the subdivision applications. Clearly, the case against defendant was "an element of the minimum mandatory unit" of this litigation, Zaromb, supra, 166 N.J. Super. at 27, 398 A.2d 1308, and should have been joined.
Moreover, the earlier prerogative writs action was properly given preclusive effect by the trial judge on collateral estoppel grounds. Collateral estoppel is a branch of res judicata which bars relitigation of an issue of law or fact, which has been actually determined in a prior proceeding, generally between the same parties involving a different claim or cause of action. T.W. v. A.W., 224 N.J. Super. 675, 682, 541 A.2d 265 (App.Div. 1988). The following factors should be evaluated in determining whether the collateral estoppel bar is to be imposed:
(1) the issue decided in the prior adjudication was identical with the one presented in the subsequent action;
(2) the prior action was a judgment on the merits;
(i) the matter or fact was directly at issue and necessary to support the judgment rendered in the prior action;
(ii) the matter or fact was actually litigated and determined;
(3) the party against whom it was asserted had been a party or in privity with a party to the earlier adjudication. [Allesandra v. Gross, 187 N.J. Super. 96, 105, 453 A.2d 904 (App.Div. 1982)].
See also E.I.B. v. J.R.B., 259 N.J. Super. 99, 101, 611 A.2d 662 (App.Div. 1992).
Plaintiffs argue that were defendant's actions on the 1986 application was not fully and fairly litigated and that, in any event, the mutuality rule precludes application of the doctrine of collateral estoppel. Our opinion on the appeal in the prerogative writs action stated:

*400 The record contains sufficient evidence to sustain the township engineer's ruling that plaintiffs' revised application was incomplete as of November, 1986. While the plaintiffs' attorney objected to the Board's ruling that the revised application was a "new application", there is no indication in the record that there was an objection to the township engineer's decision concerning the completeness of the application. In any event, the record reflects that plaintiffs voluntarily withdrew their application and elected to proceed with a new application in January, 1987.
We concluded:
Because of the topography of the subject property, subdivision of it poses very unique planning considerations relative to slope and drainage. We find no evidence that the Board had closed its mind to subdivision approval. Rather, the conditions under which the Board was willing to accept a subdivision were adequately spelled out in the record. In light of the testimony before the Board, including the testimony of plaintiffs' own witnesses, those conditions were clearly reasonable. Plaintiffs chose not to meet those conditions.
This issue was properly before us on the appeal because plaintiffs specifically prayed for "approval of the November 1986 subdivision plan submitted by plaintiffs, as modified" in the prerogative writs action. In light of this, plaintiffs' contention that they have not had their "day in court on the [November] 1986 application, its completeness, and the negligence or wrongful conduct of [defendant] in that regard" is plainly incorrect.
Plaintiffs' argument that defendant's absence as a party in the prior action raises the spectre of lack of mutuality as a bar to the imposition of the doctrine of collateral estoppel is equally unavailing. The mutuality rule which declares that neither party shall be bound by a prior action unless both would be bound by it is not a hard and fast prerequisite to the application of the doctrine of collateral estoppel especially where, as here, the doctrine is invoked defensively. Kortenhaus v. Eli Lilly & Co., 228 N.J. Super. 162, 165, 549 A.2d 437 (App.Div. 1988); Allesandra, supra, 187 N.J. Super. at 104, 453 A.2d 904. In these circumstances, what is involved is a discretionary weighing of economy against fairness. This requires an assessment of the prior litigation. As we have indicated, the claims against defendant were an integral part of the underlying subdivision controversy which were fully and fairly litigated in the earlier case. It is true, as plaintiffs contend, that application of the doctrine here will result in the denial of a jury trial which remedy was not available in the earlier *401 case. In the absence of equitable considerations, See Restatement (Second) of Judgments § 29 (1982), this is insufficient to preclude application of the doctrine. Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 334 n. 21, 99 S.Ct. 645, 653 n. 21, 58 L.Ed.2d 552, 563 n. 21 (1979); Van Dissel v. Jersey Cent. Power & Light Co., 194 N.J. Super. 108, 122-23, 476 A.2d 310 (App.Div.), certif. den. 99 N.J. 186, 491 A.2d 690 (1984). See also Battista v. Olson, 250 N.J. Super. 330, 335, 594 A.2d 260 (App.Div.), certif. den. 127 N.J. 553, 606 A.2d 366 (1991); Falcone v. Branker, 135 N.J. Super. 137, 151, 342 A.2d 875 (App.Div. 1975) (right to jury trial does not act as bar to motions for summary judgment). The economy of not relitigating plaintiffs' fully litigated action in lieu of prerogative writs is obvious. There is simply no countervailing fairness issue.
We thus affirm the dismissal of this litigation on entire controversy and collateral estoppel grounds.
Affirmed.
NOTES
[1] Cogdell was decided while the prerogative writs action was still pending. Thus, plaintiffs had the opportunity to include defendant as a party in that case.