274 N.J. Super. 405 (1994)
644 A.2d 626
CIRCLE CHEVROLET COMPANY, A NEW JERSEY CORPORATION AND THOMAS J. DEFELICE, SR., PLAINTIFFS-APPELLANTS,
v.
GIORDANO, HALLERAN & CIESLA, A P.C., AND PETRICS, MESKIN, NASSAUR & DAMBACH, ACCOUNTANTS AND AUDITORS, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 14, 1993.
Decided February 16, 1994.
*408 Before Judges BRODY, STERN and KEEFE.
Ronald L. Lueddeke argued the cause for appellants.
Richard L. Friedman argued the cause for respondent, Giordano, Halleran & Ciesla, P.A. (Giordano, Halleran & Ciesla, attorneys; Lawrence J. Sharon, on the brief).
Christopher J. Carey argued the cause for respondent Petrics, Meskin & Nassaur f/k/a Petrics, Meskin, Nassaur & Dambach (Tompkins, McGuire & Wachenfield, attorneys; Michael S. Miller, on the brief).
KEEFE, J.A.D.
The sole issue presented on appeal is whether the trial judge erred in dismissing plaintiffs' professional negligence suit against the law firm of Giordano, Halleran & Ciesla, P.C., (GH & C) and the accounting firm of Petrics, Meskin, Nassaur & Dambach (Petrics) because it was barred by the entire controversy doctrine. *409 For the reasons stated herein, we conclude that the trial judge did not err in dismissing the complaint.
Plaintiff Circle Chevrolet Company (Circle) is a privately owned New Jersey corporation that operates a car dealership in Shrewsbury, New Jersey. Thomas J. DeFelice, Sr. (DeFelice) is the president and sole shareholder of Circle.[1] The dealership is located on land owned by Masward II, a partnership consisting of DeFelice, his brother Edward DeFelice, and Albert North, each of whom hold equal one-third interests.
A 30 year lease, drafted by John Giordano of GH & C, currently exists between Masward II and Circle. The lease, which commenced on October 1, 1972, includes four additional five year option periods at the conclusion of the original 30 year term.[2] Base rent for the land pursuant to the lease was $24,000 per year for the first ten years. The lease contains a clause that provides for rent increases in the eleventh, sixteenth and twenty-first years after commencement of the lease, as well as upon the initiation of any five year renewal period. The formula for computing the increase is provided in the lease as follows:
The percentage increases, if any, in the level of the official CONSUMER UNITED STATES DEPARTMENT OF LABOR INDEX [(C.P.I.)] as published for the quarterly period of the year immediately prior to the commencement of the rent adjustment period (i.e. commencement of the eleventh, sixteenth, twenty-first year of the original Lease term and commencement of each five (5) year renewal term) over the level of such index as published for the quarterly period covering the commencement date of the original term of this Lease. (emphasis added).
In March 1985, discussions commenced between Circle and Masward II regarding the rent increase that was to take effect in the eleventh year.[3] At the time of these discussions, Masward II *410 was represented by the law firm of Gaughran & Steib, while Circle was represented by defendant GH & C.
Gaughran, utilizing a formula that has been termed the "Gaughran Method" throughout this litigation, calculated the rent increase based upon the actual increase in the C.P.I. from February 1973 to February 1983. That calculation, however, was incorrect in that it was not based upon the percentage increase in the C.P.I. as was required by the above quoted lease provision. No one from GH & C reviewed or questioned Gaughran's formula. In April 1985, defendant Petrics was engaged by DeFelice to review Gaughran's formula. Petrics responded that the calculation made by Gaughran was correct, assuming the C.P.I. numbers quoted by him were correct.
However, Circle failed to pay the increased rent, resulting in Masward II commencing litigation in 1985. At no time during the course of the 1985 litigation did GH & C question the accuracy of the Gaughran calculation. The litigation was eventually settled. The settlement agreement incorporated the Gaughran method for computing rent increases.
It was not until February 24, 1988, upon receipt of notice from Gaughran that another increase was about to take effect, that Thomas Pliskin of GH & C reviewed Gaughran's calculations and discovered that an error had been made. Pliskin advised Gaughran of the error by letters dated March 9, 1988 and March 11, 1988. Circle admits being informed of the mistake at that time.
GH & C filed a declaratory action on behalf of Circle to reform the 1985 settlement between Masward II and Circle in order to reflect the correct rental increase calculation, (hereinafter, the "settlement reformation litigation.") The reformation remedy was premised on the theory that a mutual mistake of fact had been made.
In November 1988, during the course of the settlement reformation litigation, GH & C withdrew as Circle's counsel after an alleged conflict of interest issue was raised by the attorney for the *411 individual members of the Masward II partnership stemming from Giordano's involvement in drafting the lease. The firm of Blaustein & Wasserman ("Wasserman") was substituted as counsel for Circle.
The initial meeting between Alan Wasserman, Esq., and Circle took place on January 26, 1989. There is some dispute as to the advice Wasserman gave Circle. Wasserman maintains that he informed Circle that "there is some culpability" on the part of GH & C and a "viable case against Petrics." Wasserman said he would not represent Circle if Circle decided to join GH & C because GH & C had referred the case to him, but offered to "give them new counsel if that was their intention." Circle, however, contends that Wasserman never informed it of possible claims against GH & C or Petrics. Circle maintains that Wasserman only advised it "off the record" about a possible claim against GH & C, after the settlement reformation litigation was concluded in 1990. Moreover, Circle asserts that it did not anticipate the need to file additional claims following the settlement reformation litigation because Wasserman advised it that all legal fees to the Wasserman firm would be paid by Masward II, as Masward II's position in that action was frivolous. In any event, neither GH & C nor Petrics were joined as defendants in the settlement reformation action against Masward II. However, they were called as witnesses by Circle.
The settlement reformation litigation was eventually tried. The trial judge held that the Gaughran calculation was incorrect as a matter of law, and was not the result of a mutual mistake of fact. Thus, the reformation sought by Circle was denied.
Circle obtained current counsel and commenced this professional malpractice action against GH & C and Petrics. Circle's amended complaint alleges that both defendants were negligent in reviewing the rental increase calculation, resulting in overpayment of rent by Circle as well as the payment of unnecessary legal fees and costs.
*412 On April 3, 1992, Judge Strelecki granted Petric's and GH & C's respective motions to dismiss Circle's action, finding that Circle's action was barred by the entire controversy doctrine. This appeal followed.

I
In Cogdell v. Hospital Center at Orange, 116 N.J. 7, 560 A.2d 1169 (1989), the Supreme Court, for the first time, determined that the entire controversy doctrine encompassed the mandatory joinder of parties as well as claims. Id. at 26, 560 A.2d 1169. The Cogdell decision was issued on July 24, 1989 with the direction that it be applied "prospectively and to all cases not already on appeal." Id. at 28, 560 A.2d 1169. In Reno Auto Sales, Inc. v. Prospect Park Sav. & Loan Ass'n, 243 N.J. Super. 624, 581 A.2d 109 (App.Div. 1990) we held that the phrase "all cases not already on appeal" meant pending cases involving "the first lawsuit arising out of a common occurrence or transaction." Id. at 627 n. 2, 630, 581 A.2d 109. The settlement reformation litigation was the first lawsuit that addressed the mistake made by GH & C and Petrics resulting in excess rents being paid by Circle. It was still pending on July 24, 1989 when Cogdell was decided. Moreover, that suit was not terminated until August, 1990. Circle had more than sufficient opportunity to comply with the Cogdell mandate. See id. at 630, 581 A.2d 109. Thus, the entire controversy doctrine applies to the settlement reformation suit unless Circle can establish some exception to the general rule.

II
Circle maintains that the entire controversy doctrine is not applicable because a cause of action against GH & C and Petrics did not accrue until after the settlement reformation suit was decided against Circle in August, 1990. Circle contends that it could not know if it was damaged by GH & C's and Petric's error until that time.
*413 Determining when the cause of action accrued is important in applying the entire controversy doctrine. Cafferata v. Peyser, 251 N.J. Super. 256, 260, 597 A.2d 1101 (App.Div. 1991).
The knowledge of the existence of a cause of action which will invoke the entire controversy doctrine is the same as the knowledge which will trigger the running of the statute of limitations in those cases to which the discovery rule of deferred accrual is applicable.
[Ibid.]
Professional malpractice actions are grounded in the tort of negligence. See Levine v. Wiss & Co., 97 N.J. 242, 246, 478 A.2d 397 (1984) (accounting malpractice); Gautam v. DeLuca, 215 N.J. Super. 388, 396, 521 A.2d 1343 (App.Div. 1987) (legal malpractice). Accordingly, a claim for professional malpractice damages accrues when the professional's negligence is the proximate cause of the client's damages. See, e.g., Gautam, supra, 215 N.J. Super. at 397, 521 A.2d 1343 ("[T]he claimant must show by a preponderance of the evidence what injuries he suffered as a proximate consequence of the [professional's] breach of duty.").
In certain instances, however, a plaintiff may not be aware of the circumstances that constitute an actionable claim. In such instances, the discovery rule postpones the commencement of a cause of action until a plaintiff knows, or should have known, of facts which establish 1) that an injury has occurred, and 2) that fault for that injury can be attributed to another. Lynch v. Rubacky, 85 N.J. 65, 70, 424 A.2d 1169 (1981).
Legal malpractice is an area to which the discovery rule has been applied. Grunwald v. Bronkesh, 131 N.J. 483, 494, 621 A.2d 459 (1993); Mant v. Gillespie, 189 N.J. Super. 368, 372, 460 A.2d 172 (App.Div. 1983). As in all other instances where the discovery rule has been applied, injury and attributable fault are the key elements to satisfying the discovery rule. Grunwald, supra, 131 N.J. at 495, 621 A.2d 459. While actual injury to a client may exist in the form of an adverse judgment, such a judgment is not required in order for a cause of action to accrue. Id. at 495-96, 621 A.2d 459. For example, a client may suffer *414 injury in the form of legal fees before any final judgment is reached. Id. at 495, 621 A.2d 459 (citing Mant, supra, 189 N.J. Super. at 374, 460 A.2d 172). See also Busch v. Biggs, 264 N.J. Super. 385, 398-99, 624 A.2d 1017 (App.Div. 1993) (cause of action against township engineer accrued at the time property owner, who had challenged township engineer's recommendations throughout the case, became aware of those recommendations, even though effect of engineer's tortious conduct could not be determined until after prerogative writs case by owner against township was decided). In Grunwald, while recognizing that it was possible for damages to be extinguished or modified on appeal, the Supreme Court nonetheless held that such a result "[did] not alter the time when the underlying injury or harm occurs and becomes cognizable for purposes of triggering the accrual of a cause of action." Grunwald, supra, 131 N.J. at 496, 621 A.2d 459.
As to the element of fault, a cause of action for legal malpractice accrues when the plaintiff knows or should know that the injury is attributable to the attorney's negligence. Id. at 497, 621 A.2d 459 (citing Lynch, supra, 85 N.J. at 76, 424 A.2d 1169). "A plaintiff's cause of action is not deferred until he or she learns the legal effect of those facts." Id. 131 N.J. at 500, 621 A.2d 459. See also Aykan v. Goldzweig, 238 N.J. Super. 389, 392, 569 A.2d 905 (Law Div. 1989) (in attorney malpractice suit, cause of action was deemed to have accrued when plaintiff became aware at college seminar that the attorney who was still in the process of handling plaintiff's divorce case incorrectly set the effective date of equitable distribution).
While New Jersey has yet to apply the discovery rule in accounting malpractice contexts, no reason exists why the rule should not apply to those cases as well. Several jurisdictions have adopted the discovery rule in such cases. See Sato v. Van Denburgh, 123 Ariz. 225, 599 P.2d 181 (1979); Cameron v. Montgomery, 225 N.W.2d 154 (Iowa 1975); Isaacson, Stolper & Co. v. Artisans' Sav. Bank, 330 A.2d 130 (Del. 1974); Leonhart v. Atkinson, *415 265 Md. 219, 289 A.2d 1 (1972); Johnson v. Reehoorn, 56 Wash. App. 692, 784 P.2d 1301 (1990). Thus, a cause of action in an accounting malpractice case accrues when facts are established which reveal that a client knew or should have known that injury occurred, and that the injury was the fault of the accountant.
Applying the foregoing principles to this case, it is clear that the cause of action against both GH & C and Petrics accrued well before the August, 1990 resolution of the settlement reformation litigation. Circle knew that it had suffered a legally cognizable injury in the form of rent overpayments as early as March 9, 1988, the date that Pliskin mailed a letter to Gaughran and Circle informing them that a mistake had been made in the rent calculation. Circle conceded this fact in its trial court brief. Indeed, the entire purpose of the settlement reformation litigation was to resolve the error in the rent payment calculation that was causing Circle to overpay.
At the same time Circle became aware that a mistake regarding the rental calculations was made, it likewise knew that the fault for the mistake fell at least partially on GH & C and Petrics because they were specifically instructed by Circle to review the Gaughran calculation. Pliskin's March 9, 1988 letter states that "[a]ll those persons involved with the determination of the rent, including me, have to the point of this letter been mistaken." Circle does not deny that it attributed the mistake to GH & C and Petrics. Indeed, Circle's letter brief filed in response to GH & C's cross-motion for dismissal states "that from and after February 1988, plaintiffs herein knew a mistake had been made as to rental increase calculations."
We conclude that the cause of action accrued against GH & C and Petrics in March, 1988 in that Circle had knowledge that damage had occurred, and the damage was attributable to the fault of Petrics and GH & C. It may very well be that Circle was led by GH & C to believe that, despite its mistake, Circle's damages could be rectified by a reformation suit against Masward II. For that reason, it is appropriate to toll the running of the *416 statute of limitations against GH & C during the course of GH & C's alleged negligent representation of Circle. Grunwald, supra, 131 N.J. at 498, 621 A.2d 459.
However, GH & C withdrew from the settlement reformation suit in November, 1988. After GH & C withdrew, its legal obligation to advise Circle ceased. Circle was represented by independent counsel at least by January, 1989 when Wasserman met with Circle. When Cogdell was decided seven months later it was Wasserman's duty to advise Circle of its significance. Any factual dispute as to whether he discharged that duty is irrelevant to this appeal. Circle does not allege that Wasserman was the alter ego of GH & C to the end that Circle's cause of action against GH & C should also be tolled during his representation. Indeed, no legal significance attaches to the fact that Circle was referred to Wasserman by GH & C, at least with respect to the accrual of Circle's cause of action. See id. at 488, 621 A.2d 459 (Defendant attorney's firm referred plaintiff to both trial counsel and appellate counsel, but the fact of the referral played no part in the Court's determination as to when the cause of action accrued).

III
Circle argues that Cogdell is not unbounded in requiring the joinder of parties, and that, under the circumstances of this case, joinder of GH & C and Petrics would result in unfairness to Circle, confusion in the presentation of issues and distortion of the truth-determining process. Adopting Justice Handler's concurring opinion in Crispin v. Volkswagenwerk, 96 N.J. 336, 476 A.2d 250 (1984), the Cogdell Court addressed this concern:
[The limits of the mandatory joinder rule] are reached when the joinder would result in significant unfairness or jeopardy to a clear presentation of the issues and just result. Implicit in the development of the entire controversy doctrine is the recognition that economies and the efficient administration of justice should not be achieved at the expense of these paramount concerns.... Any possible unfairness to litigants, confusion in the presentation of issues, administrative unmanageability, or distortion in the truth-determining process that may result from compulsory joinder of parties  or claims  can be eliminated or at least minimized by a trial court possessed of the discretion to excuse joinder or to order severance.

*417 [Cogdell, supra, 116 N.J. at 27-28, 560 A.2d 1169 (quoting Crispin, supra, 96 N.J. at 354-55, 476 A.2d 250).]
While principles of fairness mandate that the party whose claim is to be barred have a reasonable opportunity to fully litigate that claim in the original action, Cafferata, supra, 251 N.J. Super. at 261, 597 A.2d 1101, it is equally clear that "all parties with a material interest, one that can affect or be affected by the judicial outcome of a legal controversy, should participate in its litigation." Cogdell, supra, 116 N.J. at 23, 560 A.2d 1169. Contrary to Circle's argument, the circumstances of this case are not analogous to those cases which declined to apply the entire controversy doctrine for reasons of fairness. See, e.g., Jersey City Police Officers Benevolent Ass'n v. City of Jersey City, 257 N.J. Super. 6, 12, 607 A.2d 1314 (App.Div. 1992) (entire controversy doctrine not applicable to subsequent litigation when the implementation of an arbitration award raised issues that were not originally considered by the arbitrator or the parties and thus could not be resolved in the earlier litigation); Cafferata, supra, 251 N.J. Super. at 261, 597 A.2d 1101 (settlement of collection claim brought by physician in special civil part did not bar patient from later bringing malpractice action against physician because patient did not have a "fair and reasonable opportunity" to resolve the malpractice action during the special civil part action).
Circle's concerns are groundless. The settlement reformation suit was premised on the mutual mistake of all parties, and a necessary element of that theme was GH & C's concession that it had been mistaken in its interpretation of the lease. Petric's mistake was in writing, and was also a part of the reformation claim. Those facts were immutable, and could not have been changed by GH & C or Petrics had Circle elected, after Cogdell, to join them as defendants. Whether GH & C's and/or Petric's mistake was a product of negligence was an issue that could easily have been presented in the settlement reformation suit as an alternative form of recovery in the event that the "mutual" mistake theory was rejected. Because the facts that undergirded both forms of relief were essentially the same and suggested *418 alternative but not inconsistent remedies, we perceive no unfairness in requiring Circle to have complied with the entire controversy doctrine.

IV
Finally, Circle argues that the entire controversy doctrine's goal of putting an end to subsequent litigation involving the same controversy will not be met by applying the doctrine in this case. Circle asserts that it will bring suit against both GH & C and Wasserman for failure to inform Circle that it had a viable claim against GH & C and Petrics, and that failure to raise those claims during the settlement reformation litigation would result in subsequent claims being barred under the entire controversy doctrine.[4]
Circle is mistaken in its belief that it can bring a subsequent suit against GH & C on this theory. GH & C's failure to advise Circle that GH & C and Petrics could be sued was an issue inextricably tied to the settlement reformation litigation and was, thus, a part of that controversy; the controversy being who, if anyone, was responsible for Circle having to pay more rent than the lease required. Circle is simply attempting to disguise its prior argument, which we have rejected, in different words.
Circle's same argument, as it applies to Wasserman, does not appreciate the fact that the entire controversy doctrine applies to a single controversy. The controversy in both the settlement reformation litigation and the instant malpractice action against GH & C and Petrics focuses on the mistake made in the rental calculation and the responsibility for that mistake. Any subsequent action against Wasserman would have no relation to that issue, but would be limited to whether Wasserman was negligent in failing to inform plaintiffs that GH & C and Petrics should be joined, and that the entire controversy doctrine could bar any *419 future claims if they were not. Consequently, Circle's argument on this point is not persuasive.
Affirmed.
STERN, J.A.D. (dissenting).
The majority in essence concludes that plaintiffs' suit against their former attorneys is barred by the entire controversy doctrine because the attorneys were not joined in litigation commenced by those attorneys on behalf of plaintiffs. In its analysis, my colleagues conclude that (1) plaintiffs knew they had "suffered a legally cognizable injury in the form of rent overpayments as early as March 9, 1988," the date counsel informed "them that a mistake had been made in the rent calculation" and, hence, in the settlement of the 1985 litigation (at 415, 644 A.2d at 631); (2) once the attorneys withdrew from the settlement reformation litigation their "legal obligation to advise Circle ceased" (at 416, 644 A.2d at 631), and their new counsel (to whom they were referred by their former attorneys) owed plaintiffs an independent legal duty to advise of the consequences of not endeavoring to include a negligence claim against defendants, and (3) such joinder could not have affected defendants' testimony in the settlement reformation litigation "[b]ecause the facts that undergirded both forms of relief were essentially the same and suggested alternative but not inconsistent remedies" (at 417-18, 644 A.2d at 632). A reading of each part of the majority opinion separately might lead the reader to conclude that its analysis is faultless, but because one likes dough, tomato sauce and cheese does not mean that he or she must enjoy pizza.
I read the majority to conclude that a client must assert a claim against his or her lawyer every time a reformation action is commenced involving a transaction in which the attorney was involved. It also suggests that a client should assert a claim against the lawyer when seeking to vacate a settlement which was allegedly made in error in the cause. As no issues are raised and briefed concerning what might happen if the professional negligence *420 action were joined in the rent reformation litigation, I need not address that subject at length. Suffice it to say that, independent of the question of the need to bifurcate or sever because of the inability to address the issue of damages until resolution of the claim for reformation, I have reservations concerning whether the negligence claim seeking damages can properly be litigated in the proceedings with the claim seeking equitable reformation. In any event, I do not believe plaintiff should be required to litigate the question of an attorney's competence at the time it is advancing the theory (embodied in the complaint drafted by those attorneys) that competent counsel, together with other professionals, made a "mutual mistake." It seems to me that neither practicality nor the entire controversy doctrine suggests such a disposition, particularly with respect to a case already pending when Cogdell v. Hospital Center at Orange, 116 N.J. 7, 560 A.2d 1169 (1989), was decided.
It is true that Cogdell concluded "that the entire controversy doctrine appropriately encompasses the mandatory joinder of parties" and held "that to the extent possible courts must determine an entire controversy in a single judicial proceeding and that such a determination necessarily embraces not only joinder of related claims between the parties but also joinder of all persons who have a material interest in the controversy." Id. at 26, 560 A.2d 1169. It is also true that Cogdell was "applied only prospectively and to all cases not already on appeal," as here. Id. at 28, 560 A.2d 1169. But, unlike Cogdell which involved a baby whose condition was known when the medical malpractice litigation was commenced, this case involved only the possibility of liability for professional malpractice depending upon the result of the litigation in which defendants were indispensable witnesses for plaintiff.
I do not suggest that defendants could not have been joined in the reformation litigation while it was still pending. See Busch v. Biggs, 264 N.J. Super. 385, 397, 624 A.2d 1017 (App.Div. 1993). I conclude only that plaintiffs' present action should not be barred because defendants were not joined in the case commenced on *421 plaintiffs' behalf by one of the defendants.[1]Cf. Cafferata v. Peyser, 251 N.J. Super. 256, 261, 597 A.2d 1101 (App.Div. 1991) (no bar to second suit where no "fair and reasonable opportunity to have fully litigated that claim in the original action").
My colleagues recognize that the mandatory joinder rule of Cogdell has limits expressly embodied in the opinion. Those limits were stated in Justice Handler's concurring opinion in Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 354-55, 476 A.2d 250, quoted in Cogdell, supra, 116 N.J. at 27-28, 560 A.2d 1169:
Its limits are reached when the joinder would result in significant unfairness or jeopardy to a clear presentation of the issues and just result. Implicit in the development of the entire controversy doctrine is the recognition that economies and the efficient administration of justice should not be achieved at the expense of these paramount concerns. The entire controversy doctrine does not demand monolithic adjudications. Any possible unfairness to litigants, confusion in the presentation of issues, administrative unmanageability, or distortion in the truth-determining process that may result from compulsory joinder of parties  or claims  can be eliminated or at least minimized by a trial court possessed of the discretion to excuse joinder or to order severance.
See also Burrell v. Quaranta, 259 N.J. Super. 243, 253, 612 A.2d 379 (App.Div. 1992); Cafferata v. Peyser, supra.
It may well be that if plaintiff DeFelice is correct and Wasserman never told him "about possible claims against either Petrics or Giordano" at their initial conference, our affirmance may result in a malpractice suit against Wasserman. DeFelice certified that he was not advised about making a claim against the Giordano firm until "after" the decision in the settlement reformation litigation and was "never told" by Wasserman "of a possible claim against the Petrics firm." In fact, DeFelice asserted that his present claim against Petrics was filed by his present counsel only "after the Giordano firm made the Petrics firm a party to this action."
*422 Having concluded that the mandatory joinder of parties component of the entire controversy rule does not require dismissal of plaintiffs' present claims against his former attorneys, I must also conclude in these circumstances that because the 1988 settlement reformation litigation commenced by the Giordano firm was pending when Cogdell was filed, and was premised on a theory of "mistake" inconsistent with a malpractice suit against any professional, that it would also be unfair to plaintiffs to bar the suit against Petrics, at least without fact-finding that Wasserman advised plaintiffs of the ability to bring suit against Petrics incident to the pending litigation, as claimed by Wasserman. The totality of circumstances here does not require rigid adherence to the entire controversy doctrine to bar the present claims against defendants because they were not joined in litigation on plaintiffs' behalf commenced by one of the present defendants.
I respectfully dissent.
NOTES
[1] We shall use the word "Circle" throughout this opinion to refer to both plaintiffs, Circle and DeFelice.
[2] A supplement to the lease dated June 30, 1983, increased the available number of five year option periods from four to eight.
[3] While the eleventh year of the lease term actually occurred in 1983, the rental increase was "overlooked" by the Masward II partners until 1985.
[4] This argument cannot be raised against Petrics because, as an accountant, it is not responsible for any legal advice that was or was not rendered to Circle.
[1] The reformation complaint and theory of litigation may have been structured differently in litigation commenced after Cogdell was decided. And in the majority's view, Cogdell would suggest that counsel withdraw before commencing a reformation suit as filed here.