276 N.J. Super. 234 (1994)
647 A.2d 1318
JOSEPH V. DiTROLIO, PLAINTIFF-APPELLANT,
v.
LEONARD ANTILES, PETER BOORJIAN, DOMENIC FALCONE, OLEH BACHYNSKY, AND THE MONTCLAIR UROLOGICAL GROUP, P.A., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 30, 1993.
Decided September 27, 1994.
*237 Before Judges MICHELS, SKILLMAN and KESTIN.
Frank R. Ciesla argued the cause for appellant (Giordano, Halleran & Ciesla, attorneys, Mr. Ciesla and John F. Varley, III, of counsel and on the brief).
Glenn A. Clark argued the cause for respondents Antiles, Boorjian, Falcone, and Bachynsky (Riker, Danzig, Scherer, Hyland and Perretti, attorneys, Edward A. Zunz Jr. and Mr. Clark, of counsel, Mr. Zunz, Mr. Clark and Debra H. Azarian, on the brief).
*238 David P. Weeks argued the cause for respondent Montclair Urological Group (MacKenzie, Welt, Maher, North & Weeks, attorneys, Mr. Weeks, of counsel, Jonathan W. Philipp, on the brief).
The opinion of the court was delivered by KESTIN, J.A.D.
Plaintiff's complaint was dismissed by the trial court on entire controversy grounds, R. 4:30A, by reason of his failure to have joined the defendants as parties in an earlier lawsuit. The trial court also based its dismissal on plaintiff's failure to comply with R. 4:5-1(b)(2). Other grounds for dismissing plaintiff's suit raised in defendants' motion for summary judgment were not addressed by the trial court.
In 1984, plaintiff was admitted to the medical staff of Mountainside Hospital (Hospital) as a provisional staff member in the Department of Urology (Department), i.e., subject to supervision and observation by active staff members. The Hospital's bylaws provided that such an appointment was for a two-year term, whereupon the individual could either be promoted to the position of active staff member in the rank of associate attending physician, with no supervision, or reappointed for a single additional term as a provisional staff member with supervision. In due course, in 1986, plaintiff applied for appointment as an active staff member.
At that time, the individual defendants in this action comprised both the Department and its Credentials Committee. Three of them, defendants Antiles, Boorjian and Falcone, practiced together as shareholders of defendant Montclair Urological Group (Group). Defendant Bachynsky practiced at the same address, but not as a member of the Group.
When plaintiff's 1986 application for appointment to the active staff came before the Hospital's Staff Membership and Credentials Committee (M & C Committee), the Department recommended *239 against appointment as an active staff member and for continued appointment as a provisional staff member under supervision and observation. In their review of plaintiff's record, the members of the Department determined "that Dr. DiTrolio has not done a sufficient number of cases to have supervision and observation removed. Therefore, he is not eligible to be promoted to Associate Attending." The Department, however, also recommended that plaintiff be permitted to perform four specified procedures without supervision or observation. The M & C Committee accepted these recommendations.
The following year, on August 20, 1987, plaintiff once again requested promotion from provisional to associate attending status; and, once again, the Department recommended against the promotion, citing seven cases that "typified Dr. DiTrolio's inability to perform up to the standards of the Mountainside Urology Department." The M & C Committee, of which defendant Antiles was a member, on February 16, 1988, accepted the Department's recommendation that plaintiff "not be reappointed to the [Hospital] medical staff because of his inability to maintain adequacy of medical care in the [Department]." The committee further recommended that plaintiff "however continue with his current privileges until due process is completed."
In a letter dated February 17, 1988, plaintiff's attorney requested a hearing pursuant to the Hospital's bylaws regarding plaintiff's "application for promotion to associate attending status ... and removal of all departmental observation and supervision," asserting "that the Membership and Credentials Committee has failed to submit to the Medical Board a recommendation regarding Dr. DiTrolio's application for promotion from provisional to associate attending status." Based on this request, an ad hoc committee of the Hospital's medical staff (Ad Hoc Committee) was constituted. It conducted hearings on nine days between May 18 and July 5, 1988, focusing
primarily on seven cases presented by the Membership and Credentials Committee to support its recommendation. However, extensive material was also presented, and considered by the Committee, relating to the supervision of Dr. DiTrolio since *240 his admission to the Staff, as well as the functioning of the Department of Urology and the review process carried out by the Membership and Credentials Committee.
The Ad Hoc Committee found that the care provided by plaintiff in the seven reviewed cases "was generally acceptable and does not justify a recommendation for non-reappointment." This Committee also determined, because plaintiff had not had an opportunity to demonstrate competence at the Hospital in three areas of complex urological surgery, that before unsupervised surgical privileges be granted with respect to radical nephrectomy, open ureteral procedures, and total cystectomy, plaintiff
present evidence, such as two or three cases in each category, done at another hospital for review of adequacy by an Ad Hoc Committee. This Committee should include at least one urological consultant from another hospital. In the event that this material is not available, an outside urologist should be hired by the hospital to supervise these cases done at Mountainside Hospital. This consultant should report directly to the Medical Staff President.
In its review of the seven cases presented, the Ad Hoc Committee heard medical testimony on behalf of the M & C Committee from the four individual defendants. Plaintiff testified on his own behalf and also presented the testimony of Drs. Selwyn Freed and Joseph J. Seebode. The Ad Hoc Committee summarized its review of each of the seven cases and concluded, with respect to all, that plaintiff's overall management of the cases had been acceptable.
The Ad Hoc Committee also stated some concerns about "the procedures followed by the Department of Urology and the Membership and Credentials Committee in this case," but noted that "the [Ad Hoc] Committee cannot conclude that there was intentional wrongdoing." The specific concerns were:
1. Department of Urology meetings were held in the Chairman's office, rather than in the hospital. Because departmental meetings are official hospital business, they should be conducted on the hospital premises.
2. Assigning supervision has apparently been at the sole discretion of the Chairman. A specific procedure for assigning supervision should be included in the Department rules, and all active members of the Department should be included to provide broadened assessment of competence.
3. The Committee is concerned that Dr. DiTrolio was not adequately informed and properly counseled at the time criticisms of his work apparently arose. It *241 is extremely important that if alleged deficiencies exist, they be discussed openly and constructively with the physician under supervision at the time they occur, not only in fairness to the physician, but in order to maintain and improve patient care in an ongoing basis.
4. The Committee is concerned that specific criteria for advancing a physician from the Provisional Staff or removing supervision and observation do not exist. Each Department should establish such criteria, which should be included in Department Rules and Regulations and which should include a reasonable number of cases, by category, to be reviewed, particularly in departments doing technical procedures. The total period of supervision and observation should not be inordinately long and generally should be completed well before initial application for promotion to the active Staff.
5. Supervision should only be reinstituted in accordance with the due process in our By-laws.
6. To foster professional and administrative vitality within each department, directors should not serve more than two consecutive 2-year terms during any 8-year period.
7. To promote impartiality, the Membership and Credentials Committee should not consist of Department Directors. The Chairman should be an At-Large member of the Medical Board and other members appointed by the President of the Medical Staff or elected by the Medical Staff as a whole.
8. The Committee is concerned about the process which was followed in the Membership and Credentials Committee. Since serious criticism of a physician could affect his or her hospital privileges, it is imperative that the basis of that criticism be meticulously explored. Written procedures for this process should be established, which should include a factfinding committee which would be empowered to perform a complete investigation and make recommendations to the full Committee.
9. The hearing process in our By-laws should be reviewed and revised.
10. A member's file should be available to him.
The Hospital's Medical Board then reviewed the matter based upon the reports of the M & C Committee and the Ad Hoc Committee, as well as statements from plaintiff, defendant Antiles, and a Dr. Holtz. The Medical Board concluded that plaintiff "should be appointed as an Associate Attending at Mountainside Hospital." It differed with the conclusions of the Ad Hoc Committee in respect of the seven cases that had been reviewed, however, determining
that in two cases ... Dr. DiTrolio deviated from the standard of good urological treatment and that the remaining five cases were not clear deviations from accepted urological standards. It was further felt by the Medical Board that these *242 two cases over a period of four years do not represent sufficient deviation from good standard of care to justify non-appointment to the Active Staff....
The Medical Board concluded further:
Since Dr. DiTrolio has not done any major intra-abdominal or retroperitoneal cases during the four years of his staff appointment at Mountainside Hospital, he should be supervised on each of these major cases as he does them in the near future. Provided they are properly managed, three cases each of trans-abdominal renal surgery, ureteral surgery and bladder surgery should be adequate for evaluation of Dr. DiTrolio's abilities in such cases.
The supervision of Dr. DiTrolio for trans-abdominal renal surgery, ureteral surgery and bladder surgery should be performed by a member of the Mountainside Hospital Department of Urology.
Dr. DiTrolio shall be permitted to do all other urological procedures without supervision.
It is important to provide supervision within the department in this manner so that there is a continuum of responsibility within the Department of Urology at Mountainside Hospital. Quality assurance is a function of the department in which a physician works. Dr. DiTrolio must be brought into the department as a responsible and responsive member so that the Department of Urology can continue to be a strong, viable specialty at Mountainside Hospital.
Plaintiff then, pursuant to the Hospital's bylaws, requested "appellate review by the [Hospital's] Board of Trustees" of the Medical Board's decision that the continuing supervision of plaintiff's performance in the specified procedures be performed by the Department of Urology. The Board of Trustees appointed an Appellate Review Committee which reported on February 2, 1989.
The Appellate Review Committee rejected as inadequate or immaterial some new evidence proffered on behalf of the M & C Committee focusing on a factual element of one of the seven review cases, as well as some allegations raised by plaintiff "that certain individuals on the Medical Staff attempted to bring pressure on ... a member of [the Appellate Review] Committee." The Appellate Review Committee saw itself as confronted with "two substantive issues ... 1) Whether it should accept the finding of the Ad Hoc Hearing Committee and the Medical Board that Dr. DiTrolio be appointed as an Associate Attending; and 2) what terms of supervision, if any, should be imposed on Dr. DiTrolio if he is reappointed." As to the first issue, the committee concluded that plaintiff "should be reappointed to the Medical *243 Staff with the rank of Associate Attending in the Department of Urology."
With respect to the second issue, the Appellate Review Committee, notwithstanding its awareness of periodic disagreements between plaintiff and his supervisors within the Department, recognized, as had the Medical Board, "the benefits to the patients that have resulted from the supervision provided by the members of the Department." The Committee went on to note that
the Department of Urology is responsible, in the first instance, for reviewing the quality of care of its members and for making recommendations to the Board of Trustees, through the appropriate Medical Staff committees, concerning the privileges and rank of its members. While it is true that there have been some conflicts between Dr. DiTrolio and his supervisors, the Committee expects that both Dr. DiTrolio and the Department members who act as supervisors will act professionally and responsibly to assure the quality of patient care in the Hospital. The Committee expects that supervision of Dr. DiTrolio can and will be carried out in the future appropriately in accordance with the regular procedures of the Department and the Rules and Regulations of the Medical staff.
The Appellate Review Committee concluded in this connection that
[s]upervision for Dr. DiTrolio should be continued for the following classes of cases: a) trans-abdominal renal surgery, b) ureteral surgery, and c) bladder surgery. Supervision should be provided by the Department of Urology in accordance with the regular procedures of the Department and the Rules and Regulations of the Medical Staff. Such supervision should include observation, as that term is defined in the Medical Staff By-laws.
Supervision for three cases in each class should be adequate for evaluation. Dr. DiTrolio should be permitted to do all other urological procedures without supervision.
On February 13, 1989, the Board of Trustees adopted the findings and conclusions of its Appellate Review Committee.
Plaintiff then filed suit against the Hospital and its Board of Trustees in the Chancery Division alleging the foregoing facts and seeking purely equitable relief. Few personal references to any of the defendants in this action are to be found in the first complaint. That complaint sought a review of the Hospital's procedures as they had been applied to plaintiff and an order embodying the essential terms of the Ad Hoc Committee's recommendations concerning continuing supervision in the three classes of cases at *244 issue. Plaintiff alleged, inter alia, that he had been subjected to an unfair procedure; that he had been denied his "right to due process under the Bylaws and New Jersey case law"; and that the basis of the Medical Board's decision was inadequate, rendering its "actions, findings and recommendations... arbitrary, unreasonable and capricious."
After almost a year, during which depositions were taken of the four individual defendants in this action, plaintiff agreed to dismiss the then pending action without prejudice; and also agreed not to institute any new action against the Hospital and its Board of Trustees based upon the foregoing allegations or any conduct of those defendants preceding February 8, 1989. The stipulation of settlement also contained the following provisions:
The plaintiff, by entering into this Stipulation of Settlement and by having this action dismissed without prejudice, in no way is limited in pursuing an action(s) against any individual(s) or entity(ies) other than the defendants in this action nor shall the Stipulation of Settlement or Dismissal Without Prejudice constitute collateral estoppel.
The filing of the Dismissal Without Prejudice and this Stipulation shall in no way affect the plaintiff's rights with respect to future applications for full privileges without supervision at the Mountainside Hospital in Montclair.
Within days after the effective date of the stipulation of settlement, plaintiff filed this suit against the four individuals who comprised the Hospital's Department of Urology at the time of the acts complained of, as well as the professional association of which three of them were members. The allegations in the second complaint focus entirely on the conduct of the individuals named as defendants. With attendant factual detail, plaintiff alleges intentional and malicious interference by defendants with plaintiff's business and professional relationships with the Hospital and its personnel; their bad faith in abusing the authority vested in them as the only members of the Hospital's Urology Department and its Credentials Committee; defendant's abuse of Hospital and committee procedures and improper use of influence with various Hospital entities and staff persons; their unreasonable interference in plaintiff's relationships with his patients; their misrepresentation to Hospital bodies and others of facts and conclusions *245 concerning the adequacy of plaintiff's performance in the Hospital; and their intentional and malicious interference with plaintiff's business and professional relationships with other hospitals and professional boards. The causes of action fall within four categories: interference with business and professional relationships, and with prospective economic advantage; defamation; intentional infliction of emotional distress; and conspiracy to monopolize the practice of urology at the Hospital.
The gravamen of this complaint bears only indirectly upon the results reached by the various Hospital bodies; rather, the focus is instead upon the improper conduct of the defendants in conveying false or misleading information to influence the attitudes of others so as to prevent plaintiff's reappointment to the Hospital staff and other positions, and with the malicious intent "to improve their competitive position against the plaintiff in the practice of Urology at the Hospital." Plaintiff seeks money damages, compensatory and punitive, for injuries to his reputation and his economic well-being and for emotional distress.
In dismissing this complaint, the trial court held that plaintiff had been obliged to amend his previous complaint when, two months after it was filed, the Supreme Court in Cogdell v. Hospital Ctr. at Orange, 116 N.J. 7, 560 A.2d 1169 (1989), expanded the application of the entire controversy doctrine. Plaintiff does not appeal from the "retroactive" application of Cogdell, see Reno Auto Sales, Inc. v. Prospect Park Sav. & Loan Ass'n, 243 N.J. Super. 624, 581 A.2d 109 (App.Div. 1990), but, instead, raises the issue whether the rule enunciated in Cogdell applies at all in the facts of this case.
The currently prevailing standard defining the entire controversy doctrine, established by the Supreme Court in Cogdell, represents an expansion of the doctrine as previously understood. Formerly, "the ... doctrine had applied only to bar later litigation of claims between those already parties to an action," Pressler, Current N.J. Court Rules, comment 1 on R. 4:30A (1994), or, at furthest reach, to "bar an independent action against a party *246 whose interest in that action was the same as that in a pending action but who had not been joined in the pending action." Cogdell, supra, 116 N.J. at 14, 560 A.2d 1169 (citing Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 476 A.2d 250 (1984)). In Cogdell, the Court took the step presaged in Crispin, when it addressed the question "whether the failure to join such a party in an action, once that action has been concluded, can serve to bar a subsequent litigation against that party involving the same legal controversy." Supra, 116 N.J. at 15, 560 A.2d 1169. The Court declared
We thus conclude that the entire controversy doctrine appropriately encompasses the mandatory joinder of parties. Accordingly, we now hold that to the extent possible courts must determine an entire controversy in a single judicial proceeding and that such a determination necessarily embraces not only joinder of related claims between the parties but also joinder of all persons who have a material interest in the controversy.
[Id. at 26, 560 A.2d 1169.]
The Court also observed that this "mandatory joinder rule ... is not unbounded," id. at 27, 560 A.2d 1169, echoing its dictum in Crispin, supra, 96 N.J. at 354-55, 476 A.2d 250, that "[t]he entire controversy doctrine does not demand monolithic adjudications" where the policy reasons for its articulation are not well served by requiring joinder of claims or parties.
We are here confronted by the need to apply the considerations governing the application of the two-pronged rule of Cogdell. Since that decision was announced, some nineteen reported cases on the trial and appellate levels have dealt with the expanded entire controversy doctrine and related issues. Some have involved joinder of claims between identical parties; others have encompassed party joinder. In seven of these cases, the doctrine has been seen as precluding a subsequent suit. See Circle Chevrolet Co. v. Giordano, Halleran and Ciesla, 274 N.J. Super. 405, 644 A.2d 626 (App.Div. 1994); Fisher v. Yates, 270 N.J. Super. 458, 637 A.2d 546 (App.Div. 1994); Busch v. Biggs, 264 N.J. Super. 385, 624 A.2d 1017 (App.Div. 1993); Burrell v. Quaranta, 259 N.J. Super. 243, 612 A.2d 379 (App.Div. 1992); Union City Assocs. v. City of Union City, 247 N.J. Super. 249, 588 A.2d 1279 (App.Div. 1991); *247 Gross v. Cohen DuFour & Assocs., 273 N.J. Super. 617, 642 A.2d 1074 (Law Div. 1993); Mortgageling Corp. v. Commonwealth Land Title Ins. Co., 262 N.J. Super. 178, 620 A.2d 456 (Law Div. 1992). In twelve cases, a subsequent suit has been seen as permissible, notwithstanding the operation of the doctrine and related principles. See Watkins v. Resorts Int'l Hotel & Casino, Inc., 124 N.J. 398, 591 A.2d 592 (1991); Liebeskind v. Mayor of Bayonne, 265 N.J. Super. 389, 627 A.2d 677 (App.Div. 1993); Schechter v. Selective Ins. Co. of America, 264 N.J. Super. 299, 624 A.2d 625 (App.Div. 1993); Jersey City Police Officers Benevolent Ass'n v. City of Jersey City, 257 N.J. Super. 6, 607 A.2d 1314 (App.Div. 1992); Ric-Cic Co. v. Bassinder, 252 N.J. Super. 334, 599 A.2d 943 (App.Div. 1991); La Mar-Gate, Inc. v. Spitz, 252 N.J. Super. 303, 599 A.2d 928 (App.Div. 1991); Cafferata v. Peyser, 251 N.J. Super. 256, 597 A.2d 1101 (App.Div. 1991); Viviano v. CBS, Inc., 251 N.J. Super. 113, 597 A.2d 543 (App.Div. 1991), certif. denied, 127 N.J. 565, 606 A.2d 375 (1992); Milone v. Nissan Motor Corp., 250 N.J. Super. 371, 594 A.2d 642 (App.Div. 1991); Reno Auto Sales, Inc. v. Prospect Park Sav. & Loan Ass'n, supra, 243 N.J. Super. 624, 581 A.2d 109; Lickfield v. Lickfield, 260 N.J. Super. 21, 614 A.2d 1365 (Ch.Div. 1992); Kimmins Abatement Corp. v. Conestoga-Rovers & Assocs., Inc., 253 N.J. Super. 162, 601 A.2d 256 (Law Div. 1991).
The common perception running through all of these cases, as well as Cogdell itself, is that the entire controversy doctrine is not to be applied automatically to preclude a subsequent suit simply because claims between identical parties not pleaded in an earlier action were raised in a subsequent suit or because the defendants in the later suit had some interest in the issues raised in the prior action. Rather, in common with other discretionary standards, a particularized evaluation is required to determine whether the policies sought to be fostered by the doctrine require its application as a preclusive principle when balanced against a litigant's right to tailor separate causes of action in ways that do not impose substantial unfairness upon other parties, unreasonably *248 fragment litigation, or negate the fair demands of judicial economy or efficiency. See Cogdell, supra, 116 N.J. at 22-24, 560 A.2d 1169. This is evident from the fact that the Supreme Court framed the question addressed in Cogdell in terms of the quality of the defendants' interests in the earlier litigation and whether the second suit was effectively part of "the same legal controversy." Id. at 15, 560 A.2d at 1171.
In Cogdell itself, the plaintiffs, having lost their medical malpractice suit against two physicians, filed a new claim against other members of the operating team, several administrators of the hospital in which the alleged malpractice occurred, and the hospital itself. Both the damage remedy sought in the second action and the injury upon which it was based were the same as in the first suit and the conduct pleaded as the basis of the tort alleged was part of the very same scenario as that depicted in the first suit, albeit with a focus on different tortfeasors.
Here, on the other hand, the remedies sought in the two lawsuits were very different. The relief pursued in the first action was by way of vindicating plaintiff's rights concerning the adequacy of the Hospital's procedures for passing upon applications for staff positions as those procedures were applied to him. See Guerrero v. Burlington County Memorial Hosp., 70 N.J. 344, 360 A.2d 334 (1976); Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 514 A.2d 53 (App.Div.), certif. denied, 107 N.J. 32, 526 A.2d 126 (1986). Inescapably, the clash between the parties had subcurrents of personal interest and economics, but it occurred within an institutional mainstream, embodying professional status and health care quality concerns as its primary elements. The second suit is a matter of personal vindication only. Plaintiff seeks damages in tort and related causes of action against particular persons involved in the process by reason of their individual and collective conduct and motivations attributable to them. Fault, especially in the tort sense, i.e., breaches of duties owing between individuals, was not at issue in the first suit. The focus in the first action was plaintiff's status. The issues bore upon the Hospital's *249 procedures, on the relationship between committees and other bodies functioning under the Hospital's aegis in the decision-making process, and on the integrity of the result reached. Unlike the second suit, it did not seek recompense for injuries to person or property; and the specifics of conduct attributable to particular individuals or their motivations had limited bearing.
In Cogdell terms, therefore, neither the controversies nor the interests of the parties defendant in the respective suits were the same, even though both actions stemmed from related facts. The soundness of the procedures leading to the decision on plaintiff's application for staff membership, or that of the decision itself, was a very different issue from whether the conduct of some of the individuals involved was malicious and self-serving as alleged by plaintiff. If plaintiff had been accepted into staff membership with no supervision, as he sought, the predicate for his cause of action against these defendants would still have existed, notwithstanding a likely limitation on the damages that could be claimed; nor would a denial of staff membership by sustainable procedures have had a necessarily validating or invalidating effect on his tort action. Given the non-congruent legal relationship between the causes of action in the respective suits, it cannot be said that participation in the first suit by defendants "would have resulted in a fuller and fairer presentation of the relevant evidence and would have enabled [a finder of fact] to make a more informed and complete determination of liability." Cogdell, supra, 116 N.J. at 25, 560 A.2d 1169. The relevant proofs in the two cases would have been too different for such a conclusion to be drawn. Given the nature of the respective proceedings, we cannot conclude that joinder "would have assured an ultimate determination [of either set of claims] that would be [more] comprehensive, just and conclusive as to all persons implicated in the controversy," ibid., than would have occurred without joinder. Ineluctably, two separate controversies existed, not one with two facets.
As regards the second policy upon which Cogdell is grounded, party fairness, there can be no basis for concluding here, as *250 the Supreme Court did in Cogdell, that "[t]hese defendants may well have concluded by the termination of the prior action that they were no longer targets." Ibid. As is evident from the statement of Francis A. Wood, M.D., to the Appellate Review Committee on January 10, 1989, while the Hospital's internal processes were in progress and months before the first suit was filed, plaintiff had made no secret of his intention to proceed individually in damages against the defendants. Thus, when defendants were deposed in the first action, they had ample notice and opportunity to protect their personal interests. Nor is this a situation, as in Cogdell, where individuals who might have jointly participated in the events leading to an alleged injury have lost the "opportunity to persuade a jury that will be determining their liability that the former defendants are to be blamed." Ibid. The causes of action pleaded by plaintiff against the respective defendants had no essential legal relationship, only a factual one.
Finally, in the Cogdell policy sense, it cannot be said that this action "though technically separate and independent, is in truth not much more than a re-run of the earlier suit," id. at 26, 560 A.2d 1169, thereby causing a wasteful or inefficient use of judicial resources. To be sure, because both causes of action stem from the same factual scenario, some elements of proof will be the same in this case as would have occurred in the prior action had it proceeded to trial; but the rule of Cogdell was not meant to suggest that all causes of action arising from a common fact situation are necessarily tied together in the legal sense into a single controversy. The existence of common fact bases is only one factor of several that determines whether a single controversy exists; and the needs of judicial economy and efficiency cannot be used to stretch the concept beyond the point that fairness requires. Cf. Watkins v. Resorts Int'l Hotel & Casino, Inc., supra, 124 N.J. 398, 591 A.2d 592. It is also logical, as Judge Skillman suggests in his concurring opinion, that considerations of efficiency and economy alone should weigh differently in a situation such as this, where a settlement of the first suit was effected within a *251 year, than they would if that action had proceeded through trial on the merits to a conclusion by the entry of judgment.
It is clear from both the terms and tone of Cogdell that not every plaintiff who has claims against multiple defendants arising from a common fact situation is required to assert those claims in a single lawsuit. In order for the right to assert claims to be transmuted into a requirement that they be asserted simultaneously, an unavoidably contingent relationship between the separate causes of action must exist to the extent, either, that a full and just result cannot be achieved in one suit without simultaneous consideration of the issues raised in the other, or the demands of fairness in consideration of all parties requires that the matters be addressed together, or the needs of judicial economy in avoiding truly duplicative efforts dictate such a result. The test to be applied goes beyond a shared involvement in the underlying facts to require an objectively ascertainable practical commonality between the legal issues as well.
We conclude, therefore, that the complaint in this matter embodies a different controversy than that which was previously dismissed without prejudice and with an express reservation of rights concerning other potential defendants. The policy considerations that inform R. 4:30A as elucidated in Cogdell furnish no reasons strongly militating in favor of applying the preclusive effect of the entire controversy doctrine to this plaintiff in the circumstances presented.[*]
*252 We reach a similar conclusion concerning the trial court's alternative ground of dismissal pursuant to R. 4:5-1(b)(2):
Each party shall include with the first pleading a certification as to whether the matter in controversy is the subject of any other action pending in any court or of a pending arbitration proceeding, or whether any other action or proceeding is contemplated; and, if so, the certification shall identify such actions and all parties thereto. Further, each party shall disclose in the certification the names of any other party who should be joined in the action. Each party shall have a continuing obligation during the course of the litigation to file and serve on all other parties and with the court an amended certification if there is a change in the facts stated in the original certification. (emphasis added by trial court).
Although dismissal is an appropriate sanction for failure to comply with the rule, Tall Timbers Property Owners Ass'n v. Tall Timbers, Inc., 217 N.J. Super. 119, 122, 524 A.2d 1315 (App.Div. 1987), distinguished in Cogdell v. Hospital Ctr. at Orange, supra, 116 N.J. at 27, 560 A.2d 1169, that sanction should not be applied automatically without full consideration of the dynamics of the individual case. The purpose of the rule is "to implement the philosophy of the entire controversy doctrine in respect of successive litigation involving an overlap, albeit not a congruent overlap, of parties," Tall Timbers, supra, 217 N.J. Super. at 124, 524 A.2d 1315, and "to provide notice to all parties in each action that there are other actions pending involving the same controversy," Pressler, Current N.J. Court Rules, comment on R. 4:5-1 (1994), so that such other parties may "take whatever ... steps may be appropriate to protect their respective interests." Ibid.
Where the entire controversy doctrine does not apply to bar a second cause of action, and where the notice purpose of R. 4:5-1(b)(2) is unnecessary because, as here, defendants were or ought to have been fully aware that plaintiff intended filing suit against them and do not contend that they were unaware of the terms of the settlement of the prior action as they were developing, the violation of the rule is only technical and imposition of a dismissal *253 sanction is inappropriate. We do not, of course, address other grounds for dismissal raised by defendants which the trial court did not consider.
Reversed and remanded.
SKILLMAN, J.A.D. (concurring).
I concur in the judgment reversing the dismissal of plaintiff's complaint. However, I believe that the decisive factor precluding dismissal of this action on the basis of the single controversy doctrine is that plaintiff's prior action was dismissed before trial pursuant to a stipulation of settlement which expressly preserved plaintiff's right to bring suit against other parties. Therefore, insofar as Judge Kestin's opinion suggests that the present action would not be barred by the single controversy doctrine even if the prior action had been tried to judgment, it speaks in broader terms than are necessary to decide this appeal.
One of the primary policies underlying the single controversy doctrine is "[j]udicial economy and efficiency  the avoidance of waste and delay." Cogdell v. Hospital Center at Orange, 116 N.J. 7, 23, 560 A.2d 1169 (1989). This policy is not implicated to the same extent when the first action arising out of a single overall controversy is settled before trial rather than being tried to judgment, because pretrial motions and case management ordinarily involve a relatively small expenditure of judicial resources compared to an actual trial. Indeed, most of a court's pretrial involvement in a lawsuit will not be duplicated in a subsequent action, especially when the subsequent action involves different claims and issues.
Another policy underlying the single controversy doctrine is "fairness to parties," id. at 15, 560 A.2d 1169, which means fairness not only to defendants and potential defendants but also to the plaintiff. See id. at 25-26, 560 A.2d 1169; see also Cafferata v. Peyser, 251 N.J. Super. 256, 261, 597 A.2d 1101 (App.Div. 1991) ("[T]he party whose claim is being sought to be barred must have had a fair and reasonable opportunity to have *254 fully litigated that claim in the original action."). Thus, courts should not allow their pursuit of the salutary objectives of the single controversy doctrine to create a trap for unwary litigants.
The danger of unfairness to litigants in the application of the single controversy doctrine is most acute where a plaintiff settles an action before trial. After a lawsuit is filed, as discovery progresses and the contours of a controversy crystallize, a plaintiff often will file amended complaints, stating new claims or joining additional parties. When a plaintiff accepts a settlement offer, this evolutionary process in the pretrial development of a lawsuit terminates. Therefore, the invocation of the single controversy doctrine to bar a plaintiff's subsequent action against a party who was not joined prior to the settlement of the original action may unfairly preclude a plaintiff from pursuing all claims against all responsible parties. Such an expansive application of the single controversy doctrine also may discourage a plaintiff who conceives that there may be other responsible parties from settling, contrary to this State's firmly established policy of encouraging the settlement of litigation. See Nolan v. Lee Ho, 120 N.J. 465, 472, 577 A.2d 143 (1990).
These considerations lead me to conclude that plaintiff's original action seeking equitable relief with respect to his operating privileges at Mountainside Hospital should not preclude him from now pursuing this action for money damages against certain doctors involved in determining the scope of those privileges. Plaintiff settled his original action with the express understanding that he would be allowed to file a new action against these defendants. In addition, as Judge Kestin notes, ante, at 249, 647 A.2d at 1326, defendants had notice of plaintiff's tentative intention to proceed against them both when they were deposed and when the original action was settled. There is also no basis for concluding that the judicial system would be unduly burdened by permitting plaintiff to maintain the present action.
I note that plaintiff could have avoided the application of the single controversy doctrine by simply filing an amended complaint *255 joining the present defendants in the original action shortly before dismissing the action against the original defendants. Rule 4:9-1 provides that after a responsive pleading has been filed, a pleading may be amended "by written consent of the adverse party or by leave of court." Read literally, Rule 4:9-1 would have authorized plaintiff, as part of his settlement with the original defendants, to have obtained their written consent to the filing of an amended complaint joining the present defendants. Moreover, even if leave of court would have been required to file such an amended complaint, see R. 4:8-1(a), there is no reason to believe, in view of the mandate of Rule 4:9-1 that leave to amend be "freely given in the interest of justice," that leave would have been denied, since the original action was then less than a year old and a trial date was not imminent. I perceive no practical difference in terms of the administration of justice or fairness to the present defendants between plaintiff amending his original complaint to join the present defendants shortly before settling with the original defendants or instead filing this new action against the present defendants shortly after settling with the original defendants.
The single controversy doctrine "is one of judicial fairness and [should] be invoked in that spirit." Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 343, 476 A.2d 250 (1984). In view of the settlement of plaintiff's prior action, I am convinced that the invocation of the single controversy doctrine to bar this action would not be fair. I would decide the appeal on this limited basis rather than the broader grounds expressed in Judge Kestin's opinion.
MICHELS, P.J.A.D. (dissenting).
I dissent because I believe that Judge Fuentes in the Law Division correctly held that plaintiff was barred from bringing this second action against defendants by the entire controversy doctrine.
R. 4:30A, which expresses with the entire controversy doctrine, provides:

*256 Non-joinder of claims or parties required to be joined by the entire controversy doctrine shall result in the preclusion of the omitted claims to the extent required by the entire controversy doctrine, except as otherwise provided by R. 4:64-5 (foreclosure actions) and R. 4:67-4(a) (leave required for counterclaims or cross-claims in summary actions).
Originally, the doctrine mandated joinder of only those claims arising from "the same overall transaction" which involved parties already named in the lawsuit. Tall Timbers Property Owners Ass'n v. Tall Timbers, Inc., 217 N.J. Super. 119, 122, 524 A.2d 1315 (App.Div. 1987). Before 1989, the doctrine had "not been extended to preclude subsequent litigation against persons who were not parties to the original action." Id. at 123, 524 A.2d 1315. See also pre-1989 cases discussing the doctrine as mandating joinder of claims only, e.g., Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 343, 476 A.2d 250 (1984), certif. denied, 126 N.J. 385, 599 A.2d 162 (1991) (recognizing that extension of the entire controversy doctrine to include mandatory joinder of parties may be appropriate in some cases, but refusing to extend the doctrine outright); Tevis v. Tevis, 79 N.J. 422, 434, 400 A.2d 1189 (1979); Applestein v. United Board & Carton Corp., 35 N.J. 343, 356, 173 A.2d 225 (1961); Brown v. Brown, 208 N.J. Super. 372, 377-78, 506 A.2d 29 (App.Div. 1986); Mori v. Hartz Mountain Development Corp., 193 N.J. Super. 47, 54-55, 472 A.2d 150 (App.Div. 1983); River Edge S. & L. Ass'n v. Clubhouse Assoc., Inc., 178 N.J. Super. 177, 182, 428 A.2d 544 (App.Div.), certif. denied, 87 N.J. 383, 434 A.2d 1066 (1981); The Malaker Corp. v. First Jersey National Bank, 163 N.J. Super. 463, 496, 395 A.2d 222 (App.Div. 1978), certif. denied, 79 N.J. 488, 401 A.2d 243 (1979); Gareeb v. Weinstein, 161 N.J. Super. 1, 10, 390 A.2d 706 (App.Div. 1978); Wm. Blanchard Co. v. Beach Concrete Co., Inc., 150 N.J. Super. 277, 292-94, 375 A.2d 675 (App.Div.), certif. denied, 75 N.J. 528, 384 A.2d 507 (1977); Leisure Technology v. Klingbeil, 137 N.J. Super. 353, 357, 349 A.2d 96 (App.Div. 1975); Falcone v. Middlesex County Medical Society, 87 N.J. Super. 486, 491, 210 A.2d 78 (App.Div. 1965), aff'd in part, rev'd in part, 47 N.J. 92, 219 A.2d 505 (1966).
In 1989 our Supreme Court extended the entire controversy doctrine to mandate joinder of "all parties with a material interest, *257 one that can affect or be affected by the judicial outcome of a legal controversy." Cogdell v. Hospital Center at Orange, 116 N.J. 7, 23, 560 A.2d 1169 (1989); see also R. 4:30A. In Cogdell, an infant plaintiff and her mother brought an action against an obstetrician and a pediatrician, among others, alleging that the doctors' negligence in delaying and then performing an emergency cesarean section birth caused serious physical injuries to the baby. A jury trial ensued in which the doctors and their experts testified that the delay in assembling the delivery team was caused in part by the hospital staff. Id. at 12, 560 A.2d 1169. The jury returned a verdict in favor of the defendants. Ibid.
Thereafter, the plaintiffs instituted a second suit against the hospital and its staff, charging them with negligence in causing the delay of the cesarean delivery. Cogdell, supra, 116 N.J. at 13, 560 A.2d 1169. The defendants argued that the entire controversy doctrine precluded the plaintiffs from bringing a second suit against the defendants, as the defendants should have been joined in the first suit. Ibid. Agreeing with the defendants, the Court extended the entire controversy doctrine to include mandatory joinder of parties "who have a material interest in the controversy." Id. at 26, 560 A.2d 1169. In expanding the scope of the doctrine, the Court examined the history and purpose behind the entire controversy doctrine. In order to evaluate whether plaintiff in the case before us is barred by the doctrine, an examination of the reasoning of Cogdell and an analysis of its principles follows.
The fundamental principle behind the entire controversy doctrine is that
the adjudication of a legal controversy should occur in one litigation in only one court; accordingly, all parties involved in a litigation should at the very least present in that proceeding all of their claims and defenses that are related to the underlying controversy.
[Cogdell, supra, 116 N.J. at 15, 560 A.2d 1169].
The original doctrine, which mandated only the joinder of claims, was designed
"to eliminate delay, prevent harassment of a party and unnecessary clogging of the judicial system, avoid wasting the time and effort of the parties, and promote fundamental fairness."

*258 [Ibid. (quoting Barres v. Holt, Rinehart and Winston, Inc., 74 N.J. 461, 465, 378 A.2d 1148 (1977) (Schreiber, J. dissenting))].
In general, "the polestar for the application of the rule is judicial `fairness'". Reno Auto v. Prospect Park S. & L., 243 N.J. Super. 624, 630, 581 A.2d 109 (App.Div. 1990) (citing Cogdell, supra, 116 N.J. at 28, 560 A.2d 1169); see also Busch v. Biggs, 264 N.J. Super. 385, 396, 624 A.2d 1017 (App.Div. 1993) ("The entire controversy doctrine furthers the twin goals of efficient judicial administration and fairness to litigants."). The focus of the pre-1989 doctrine was to promote "a judicial policy that when a matter is presented to a judicial forum, the litigants should not fractionalize their claims to the detriment of the system." Crispin v. Volkswagenwerk, A.G., 96 N.J. 336, 349, 476 A.2d 250 (1984) (quoting Thornton v. Potamkin Chevrolet, 94 N.J. 1, 8, 462 A.2d 133 (1983)). See also Busch v. Biggs, supra, 264 N.J. Super. at 396, 624 A.2d 1017 ("it is neither fair nor efficient to fragment a single controversy into separate actions"); Gareeb v. Weinstein, supra, 161 N.J. Super. at 9, 390 A.2d 706 (sound judicial administration requires that "all facets of a single dispute between parties be completely determined in one action"). Summarizing the policy behind the doctrine, the Crispin Court noted that
[i]t has been recognized that the underlying principles of the doctrine  "finality and repose; prevention of needless litigation; avoidance of duplication; reduction of unnecessary burdens of time and expenses; elimination of conflicts, confusion and uncertainty; and basic fairness"  have a central place in the adjudication of all legal controversies.
[Crispin v. Volkswagenwerk, A.G., supra, 96 N.J. at 350-51, 476 A.2d 250 (quoting City of Hackensack v. Winner, 82 N.J. 1, 32-33, 410 A.2d 1146 (1980))].
In extending the doctrine to include joinder of parties as well as claims, the Cogdell Court reasoned that the party-joinder rule, R. 4:28-1, and the claims-joinder rule, R. 4:27-1, both "reflect a common policy" and "are not only conceptually similar but are procedural twins." Cogdell, supra, 116 N.J. at 17, 560 A.2d 1169. The Court explained that the party-joinder rule is intended to promote "both fairness to parties and judicial efficiency and economy." Ibid. "Thus, the Rule tries foremost to protect an absent person from an adjudication of his or her interests; it also *259 protects all of society from repetitious, abortive, and wasteful litigation." Cogdell, supra, 116 N.J. at 17-18, 560 A.2d 1169. Because of these policies, the Court concluded that the party-joinder and claims-joinder rules "are conceptual subsets of the entire controversy doctrine". Id. at 20, 560 A.2d 1169. Thus, the Cogdell Court extended the doctrine to include mandatory joinder of parties.
The extension of the entire controversy doctrine to include mandatory joinder of parties is not limitless, however. The Court clarified that only parties with "a material interest" must be joined in a suit. Cogdell, supra, 116 N.J. at 26, 560 A.2d 1169. This standard is broader than the common law joinder of parties standard which mandated joinder of only "indispensable" parties. Id. at 18, 560 A.2d 1169. An "indispensable" party at common law was one who "`has an interest inevitably involved in the subject matter before the court and a judgment cannot justly be made between the litigants without either adjudging or necessarily affecting the absentee's interest.'" Ibid. (quoting Allen B. Du Mont Laboratories, Inc. v. Marcalus Mfg. Co., 30 N.J. 290, 298, 152 A.2d 841 (1959)). The standard for joining parties under the entire controversy doctrine, however, focuses on "party fairness." Cogdell, supra, 116 N.J. at 23, 560 A.2d 1169. Thus, parties with a material interest are defined by Cogdell as those parties "that can affect or be affected by the judicial outcome of a legal controversy...." Ibid. This standard encompasses a wider spectrum of potential parties than the common law "indispensable" standard.
Another limit on the application of the doctrine since Cogdell is that "as in the case of all other preclusionary doctrines ... the party whose claim is being sought to be barred must have had a fair and reasonable opportunity to have fully litigated that claim in the original action." Cafferata v. Peyser, 251 N.J. Super. 256, 261, 597 A.2d 1101 (App.Div. 1991) (holding that a patient's settlement of a prior action brought against him by doctors for payment of a bill did not bar medical malpractice action against doctors).
*260 Furthermore, the mandatory joinder rule of Cogdell is also limited
when the joinder would result in significant unfairness or jeopardy to a clear presentation of the issues and just result.... The entire controversy doctrine does not demand monolithic adjudications. Any possible unfairness to litigants, confusion in the presentation of issues, administrative unmanageability, or distortion in the truth-determining process that may result from compulsory joinder of parties ... can be eliminated or at least minimized by a trial court possessed of the discretion to excuse joinder or to order severance.
[Cogdell, 116 N.J. at 27-28, 560 A.2d 1169 (quoting Crispin v. Volkswagenwerk, A.G., supra, 96 N.J. at 354-55, 476 A.2d 250 (Handler, J., concurring))].
In addition to tracing the history of the entire controversy doctrine and establishing the standard by which to measure whether a party must be joined under the new interpretation of the doctrine, the Cogdell Court also emphasized that extending the doctrine to include joinder of parties is supported by the growing need for "[j]udicial economy and efficiency" and "the avoidance of waste and delay." 116 N.J. at 23, 560 A.2d 1169. The Court explained that in this present day litigation explosion, the judicial system must "conserve judicial resources; judicial energy is not inexhaustible or endlessly renewable. Thus, a rule that can control litigational extravagance and reduce piecemeal litigation is a necessity." Id. at 24, 560 A.2d 1169. The Court also noted that the extension of this doctrine does not risk exceeding ordinary judicial power, as courts have always had "broad judicial authority over joinder." Ibid.
Having presented its reasons for extending the entire controversy doctrine to mandate joinder of claims, the Cogdell Court applied the facts of the case before it to the new interpretation of the doctrine and concluded that the plaintiffs should have joined the hospital and its staff in the first suit and therefore were precluded from initiating a second suit against those defendants. 116 N.J. at 25-26, 560 A.2d 1169. In doing so, the Court summarized the factors that must be considered in determining whether joinder of a particular party is required. An analysis of those factors with respect to the facts of the case before us follows.
*261 In this case, defendants named in the second suit had a "material interest" in the first suit sufficient to mandate joinder of those defendants in the first suit. See Cogdell, supra, 116 N.J. at 26, 560 A.2d 1169. The first complaint alleged that the review process conducted by Mountainside Hospital (Hospital) and the Hospital's Board of Trustees deprived plaintiff of due process. In that suit, plaintiff demanded equitable relief, specifically, that he be reappointed to the Hospital's Medical Staff with the rank of Associate Attending in the Department of Urology, and that he be supervised either in another hospital or by an outside physician hired by the Hospital. By contrast, the second complaint demanded money damages primarily to compensate plaintiff for the alleged tortious conduct of the individual defendants. Although the two complaints allege different causes of action in law and equity, the factual bases of both actions are identical. In my view, plaintiff cannot fractionalize this litigation in order to save his second suit from dismissal.
In the first suit, at least nineteen paragraphs of the complaint implicated defendants in the factual allegations which form the basis of the action against the Hospital and its Board of Trustees. The complaint alleged that the Board of Trustee's conclusions and recommendations regarding plaintiff's denial of full staff membership did not rely upon sufficient reliable evidence and were not founded on reasonable and sensible grounds. Plaintiff also pleaded that the findings of the Medical Board were arbitrary, unreasonable and capricious.
All of these allegations are founded in a factual scenario that begins with the actions of the four doctors named as defendants in this second suit. The doctors' recommendations and presentation of evidence at the in-house hospital hearings form the basis of the Medical Board's report and recommendation. That recommendation, in turn, provided the basis of the final decision rendered by the Hospital after the completion of all appellate processes. Thus, the doctors' conduct, recommendations, and submission of evidence are inseparably entangled with the Hospital's review procedures, *262 which plaintiff challenged in the first suit. As Judge Fuentes so appropriately observed, "It is the defendant doctors' involvement in that procedural process that created the factual basis for the second lawsuit." There is no question that defendants had a material interest in the first suit.
Further support for this conclusion is found in an analysis of three additional factors examined by the Cogdell Court. First, the Cogdell Court concluded that "the participation of all potentially responsible persons as parties in the original action would have resulted in a fuller and fairer presentation of the relevant evidence and would have enabled the jury to make a more informed and complete determination of liability." 116 N.J. at 25, 560 A.2d 1169. This factor seeks to assure that the "ultimate determination ... [is] comprehensive, just and conclusive as to all persons implicated in the controversy." Ibid.
Applying this factor here compels the conclusion that the individual doctors and the Montclair Urological Group should have been named as defendants in the first action. It is irrelevant that the first suit ended in a settlement. Extensive discovery nevertheless was conducted for approximately one year while the parties prepared for the first suit. Each of the four defendant-doctors were deposed as witnesses during this discovery period. Had the doctors been named as defendants in the first action, they might have approached the depositions and discovery process differently. They might have made different strategic decisions if they were involved in the suit as more than mere witnesses. Additionally, the scope of discovery might have been broadened by naming the doctors as defendants in the first suit, which might have led to a "fuller and fairer presentation of the relevant evidence" as proposed by Cogdell. See 116 N.J. at 25, 560 A.2d 1169. Joinder of the doctors as defendants would have advanced the goal that the ultimate determination of the action was "comprehensive, just and conclusive as to all persons implicated in the controversy." See ibid.
*263 The second factor analyzed in Cogdell is "party fairness." 116 N.J. at 25, 560 A.2d 1169; see also Circle Chevrolet Co. v. G.H. & C., 274 N.J. Super. 405, 417, 644 A.2d 626 (App.Div. 1994). Mandatory joinder must be fair to all parties. With respect to fairness to the defendants that should have been joined in the first action, the Cogdell Court observed that
[t]he failure to have joined these defendants in the earlier action seems prejudicial and unfair. These defendants may well have concluded by the termination of the prior action that they were no longer targets. In addition, while technically their interests were not determined in the earlier action, they do not now have the same opportunity to persuade a jury that will be determining their liability that the former defendants are to be blamed.
[116 N.J. at 25, 560 A.2d 1169].
Since the doctors were deposed as witnesses in the first case and at least one deposition of another witness was taken under the caption "DiTrolio v. Antiles, Falcone, Boorjian & Bachynsky," the doctors might have believed that they were going to be sued. However, the first suit was initiated against the Hospital and its Board of Trustees only and the second suit was not initiated until the first suit was settled. Thus, as Cogdell warned, the doctors in this case were lulled into a false sense that they were "no longer targets", that is, that they were not going to be sued in connection with this matter. See Cogdell, 116 N.J. at 25, 560 A.2d 1169. Thus, plaintiff's failure to join the doctors as defendants in the first suit was unfair to the doctors.
With respect to fairness to a plaintiff, Cogdell instructs that mandatory joinder is not unfair to a plaintiff where "plaintiff ... [had] sufficient information to have included these defendants in the earlier lawsuit." 116 N.J. at 25, 560 A.2d 1169. In Cogdell, the plaintiff knew that the hospital staff might have been responsible for causing the delay in performing the caesarian section birth. Id. at 25-26, 560 A.2d 1169. Here, plaintiff unquestionably knew that the doctors' conduct formed the basis of the events leading to the Hospital's decision to qualify his promotion to active staff member. Plaintiff himself pleaded the conduct of the doctors in detail in the first complaint. The facts pleaded in the second complaint, although couched in terms designed to emphasize the alleged tortious conduct of the doctors, mirror the facts pleaded in *264 the first complaint in all material aspects. The chronology is identical and the entire controversy stems from the recommendation of the doctors in both complaints.
Additionally, only six days passed between the settlement of the first suit and the filing of the complaint in the second suit. Plaintiff did not demonstrate that he discovered something new in that short period of time to justify his bringing a second suit against the doctors. As we have stated previously:
We do not regard this result as a harsh one. Plaintiffs were in possession of all facts necessary to their present theories of recovery long before the [defendant] ... initiated [the first suit].... Nothing was discovered after the litigation commenced [in the first suit] relevant to the matters in the present action.
[The Malaker Corp. v. First Jersey National Bank, supra, 163 N.J. Super. at 499-500, 395 A.2d 222 (holding that the plaintiff was barred from bringing a second suit under the entire controversy doctrine)].
Thus, mandatory joinder of the doctors in the first suit would not have been unfair to plaintiff as plaintiff knew all of the facts and the possible causes of action at the time he initiated the first suit.
The third factor examined in Cogdell is the policy that mandatory joinder is appropriate to avoid "a duplication of lawsuits ... [and] multiple actions each involving the identical controversy and the same witnesses." 116 N.J. at 26, 560 A.2d 1169. The Court emphasized that, under the facts of the case before it,
[t]he second lawsuit, though technically separate and independent, is in truth not much more than a re-run of the earlier lawsuit. The waste and inefficiency are obvious.
[Ibid.]
Here, plaintiff's second complaint alleges that defendants engaged in arbitrary and capricious conduct in recommending denial of plaintiff's application for active staff membership and in supervising plaintiff. The complaint also alleges libel, slander, malicious and tortious interference with plaintiff's professional and economic relations and prospective economic advantage, intentional infliction of emotional distress, and conspiracy to monopolize the practice of urology at the Hospital in violation of the common law and New Jersey's Anti-Trust Law.
Most of the facts that must be proven to sustain these allegations concern defendants' supervision of plaintiff and subsequent *265 recommendation that plaintiff not be promoted to active staff membership. Even though some claims, such as libel, slander, interference with economic relations and conspiracy to monopolize the urology practice, may require additional evidence beyond that which would have sufficed in the first suit, this fact alone does not require that the claims be brought in two separate suits, or that defendants be sued separately from the defendants named in the first suit. In the second suit, plaintiff still must prove everything that he would have had to prove in the first suit, and then would have to present additional proofs. Plaintiff would have to drag into court for a second time all of the witnesses and arguments he would have had to present in the first suit. Although elements of the claims in the second suit require additional proof, the requisite supplemental evidence is not sufficiently distinct such that no risk of duplicitous litigation exists. Thus, the third factor of Cogdell regarding duplicitous litigation provides further support for the conclusion that defendants should have been joined in the first suit and, consequently, plaintiff is barred from bringing this second suit against them.
In sum, I would hold that plaintiff is barred from bringing the second suit under the entire controversy doctrine because (1) defendant-doctors named in the second suit had a material interest in the first suit, (2) joinder of defendant-doctors in the first suit would have promoted a comprehensive, just and conclusive outcome in the first suit, (3) joinder of defendant-doctors in the first suit would not have been unfair to either party, and (4) joinder of defendant-doctors in the first suit would have avoided duplicitous litigation.
Furthermore, without regard to the entire controversy doctrine, I am thoroughly convinced that plaintiff's claims against defendants are barred by the preclusionary principles relied upon in such pre-Cogdell cases as Zoneraich v. Overlook Hosp., 212 N.J. Super. 83, 514 A.2d 53 (App.Div.), certif. denied, 107 N.J. 32, 526 A.2d 126 (1986) and Falcone v. Middlesex County Medical *266 Society, 87 N.J. Super. 486, 210 A.2d 78 (App.Div. 1965), aff'd in part, rev'd in part, 47 N.J. 92, 219 A.2d 505 (1966).
In Zoneraich v. Overlook Hosp., supra, a physician challenged the termination of her staff privileges. The plaintiff brought three separate actions against both the hospital and the individual defendants. As in the case before us, the plaintiff's first complaint alleged due process violations and that the hearings were arbitrary and capricious. The plaintiff's second complaint alleged further improper procedures, and her third complaint included allegations of monopolization of the obstetrics and gynecology department, slander, defamation, and conspiracy. All three complaints were consolidated in the Chancery Division where the trial court held that the hospital's actions toward the plaintiff were reasonable. 212 N.J. Super. at 89, 514 A.2d 53.
Plaintiff then appealed on the ground that her tort claims and state anti-trust claims should not have been dismissed through summary judgment. We held that
the judicial affirmation of the reasonableness and propriety of the hospital's actions toward plaintiff establishes the justifiability and lawfulness of defendants' actions, determines an essential part of each of plaintiff's conspiracy, malicious interference and antitrust claims against her, and therefore collaterally estops plaintiff from relitigating those matters.
[Zoneraich v. Overlook Hosp., supra, 212 N.J. Super. at 93, 514 A.2d 53 (footnote omitted)].
We also held in Zoneraich v. Overlook Hospital, supra, that since hospital tribunals are authorized to perform quasi-judicial duties, courts must "accord preclusive effect to the determinations they make which are necessary to resolve the disputes before them," as long as the hospital tribunals conduct fundamentally fair proceedings and make their determinations in good faith and upon sufficient reliable evidence. Id. at 96, 514 A.2d 53. In this case, plaintiff had a fundamentally fair proceeding and the Medical Board made its determination in good faith and upon reliable evidence. Both parties were represented by counsel. Witnesses were presented and thorough testimony was heard. The hearings lasted nine days and produced approximately 1100 pages of transcripts. The safeguards that were lacking in Zoneraich were *267 present here. Consequently, as in Zoneraich, plaintiff should be precluded from suing the doctors in this second suit.
A similar conclusion was reached in Falcone v. Middlesex County Medical Society, supra. There, the plaintiff brought an action against the county medical society seeking to compel the society to grant him membership. During trial, the plaintiff offered no proof of damages and made no motion to amend the pleadings or pretrial order to assert a claim for damages. 87 N.J. Super. at 489, 210 A.2d 78. The plaintiff succeeded at trial and shortly thereafter was admitted to membership in the medical society.
Approximately five months later, the plaintiff brought a second action against the same defendant seeking money damages. Plaintiff unsuccessfully argued that "if he had joined a claim for money damages in his original suit, trial thereof would have probably been deferred until the basic issue of his right to membership had first been resolved." Falcone v. Middlesex County Medical Society, supra, 87 N.J. Super. at 490, 210 A.2d 78. Thus, plaintiff contended that "he was only doing belatedly in a separate action what he might have done in the first suit," and hence should not be precluded from doing so. Ibid. We barred the plaintiff's second suit on the ground of mandatory joinder of claims. We reasoned that the plaintiff should have brought a claim for damages in the first suit because "[t]here was but a single wrong, namely, the exclusion from membership, and plaintiff was obliged to seek his entire relief for that wrong in the one action." Ibid. (citing Applestein v. United Board & Carton Corp., 35 N.J. 343, 356, 173 A.2d 225 (1961)). Similarly, in the case before us, plaintiff's two actions stem from a "single wrong", namely, plaintiff's qualified promotion to active membership on the hospital staff with continued limited supervision. Thus, as in Falcone, supra, plaintiff should have brought all of his claims against all parties in the original action.
Although Gareeb v. Weinstein, supra, 161 N.J. Super. 1, 390 A.2d 706 (App.Div. 1978), at first blush appears to support a *268 contrary conclusion, that decision is readily distinguishable from the case before us. There, a physician brought an action for damages against members of a hospital committee who voted to suspend him from the medical staff. The plaintiff had previously sued the hospital's Board of Governors for the same suspension which was based on the recommendation of the same committee that was named as the defendant in the second suit. The first suit was resolved in favor of the defendants. We explained that the trial judge in the first suit
did not adjudicate the fact of Dr. Gareeb's unworthiness for staff privileges but only found that there was sufficient evidence in the record of the hospital proceedings to support the determination made by the board.
[161 N.J. Super. at 8, 390 A.2d 706].
Because of the limited scope of the first suit's resolution, we concluded in Gareeb that plaintiff could bring a second suit for damages against the individual members of the committee. Thus, Gareeb was decided on a limited basis. In fact, in Zoneraich v. Overlook Hospital, supra, 212 N.J. Super. at 96, 514 A.2d 53, we determined that the Gareeb decision was largely affected by the fact that "plaintiff [in Gareeb] did not have a full and fair opportunity to litigate those issues [i.e., the propriety of the proceedings] before defendants' committee." In Zoneraich, we explained that
Plainly, the deficiencies in the hospital hearing were sufficient to move this court to deny preclusive effect [in Gareeb].... Gareeb turned on differences in litigated facts and issues and on deficiencies in the hospital proceedings, it is not inconsistent with our decision today to give preclusive effect to results reached reasonably in proper hospital proceedings.
[Id., 212 N.J. Super. at 97, 514 A.2d 53].
Here, the hospital proceedings which governed the determination of plaintiff's status were not fraught with the severe problems that were present in the Gareeb hearings, such as the plaintiff's inability to communicate effectively in English, the refusal to permit the plaintiff to have counsel present or conduct discovery, and the fact that witnesses at the hearing were not sworn. Thus, the circumstances compelling the Gareeb court to allow a second suit on the same transaction do not apply to the case before us.
*269 The pre-Cogdell cases concerning multiple litigation brought by doctors challenging their admission to medical staffs and societies, although not dispositive of the post-Cogdell party-joinder issue, at the very least demonstrate that the common basis of plaintiff's two actions is the recommendation of the doctors which led to the Hospital's decision regarding plaintiff's qualified promotion. The challenged conduct of all defendants is rooted in a singular factual basis, and precludes plaintiff from bringing this second action.
Finally, I would not place the imprimatur of the court upon the fragmentation of this controversy merely because plaintiff chose to settle the first action before instituting the second action against these defendants.
I, therefore, would affirm the summary judgment of the Law Division under review.
NOTES
[*] We do not regard Zoneraich v. Overlook Hosp., supra, 212 N.J. Super. 83, 514 A.2d 53 and Falcone v. Middlesex County Medical Society, 87 N.J. Super. 486, 210 A.2d 78 (App.Div. 1965), aff'd in part, rev'd in part, 47 N.J. 92, 219 A.2d 505 (1966), as bearing upon the resolution of this issue, as does Judge Michels in his dissenting opinion. The decisional principle in Zoneraich was collateral estoppel. In Falcone, an entire controversy-claim joinder case, the plaintiff had failed in his first lawsuit, to assert all related claims against the named defendants and sought to litigate those remaining claims in a second lawsuit against the same defendants. Aside from these considerations, we regard pre-Cogdell cases to be of little value in applying the policies driving newer concepts of mandatory party joinder, a doctrinal variation which has not yet seen substantial development. For this reason, and because every significant difference in case dynamic may command a different result in entire controversy terms, we do not rely on Gareeb v. Weinstein, 161 N.J. Super. 1, 390 A.2d 706 (App.Div. 1978), which Judge Michels has seen fit to distinguish.